# GOLTRA *v.* WEEKS, SECRETARY OF WAR, ET AL.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 718. Argued April 27, 28, 1926.—Decided June 7, 1926.

1. A suit by one who had obtained lawful possession of a fleet of boats belonging to the United States, under a lease or charter for a term of years executed by the Chief of Engineers by direction of the Secretary of War, to enjoin the latter official and an army officer from wrongfully and forcibly taking possession of the boats in pursuance of an alleged conspiracy between them, and to require the defendants to restore some of the boats already so taken, is not a suit against the United States, and the United States is not a necessary party. *Philadelphia Co.* v. *Stimson,* 223 U. S. 605, followed. *Wells* v. *Roper,* 246 U. S. 335, distinguished. P. 544.

2. A stipulation in a lease authorizing the lessor to terminate the lease and retake the property if, in his judgment, the lessee is not complying with his obligations under the contract, is valid, and, in the absence of bad faith, the lessor's judgment on the question of compliance is conclusive. P. 547.

3. In a suit by a lessee to enjoin threatened retaking of leased property, where it appeared, on motion for a preliminary injunction, that the defendant had actually taken the property from the plaintiff's possession, but also, upon a full showing, that he had a clear right to retake it under the lease, *held* that plaintiff was not entitled to a temporary injunction restoring the possession *pendente lite,* even though the retaking had been accomplished through a wrongful show of force and was timed to avoid an injunction. P. 548.

7 Fed. (2d) 838, affirmed.

CERTIORARI to a decree of the Circuit Court of Appeals which reversed a decree of temporary injunction rendered by the District Court, in a suit by Goltra to enjoin the Secretary of War and an army officer from seizing from his possession certain boats and barges, which had been leased to him by the Chief of Engineers, acting for the United States by direction of the Secretary. The bill also prayed restoration of part of the boats, already taken; and the remainder were taken before the hearing. The decree commanded restoration of plaintiff's possession and enjoined further interference during the suit. See also *Ex parte United States*, 263 U. S. 389.

*Mr. Joseph T. Davis*, with whom *Mr. Douglas W. Robert* was on the brief, for petitioner.

The District Court, as a court of equity, had jurisdiction and authority to restrain the respondents, even though they were officers of the United States, from interference with property of the petitioner in an arbitrary, unwarranted and illegal manner; and such relief cannot be defeated upon the ground that the suit is one against the United States. *Colorado* v. *Toll*, 268 U. S. 228; *Osborn* v. *The Bank*, 9 Wheat. 738; *Noble* v. *Union River R. R. Co.*, 147 U. S. 165; *Philadelphia Co.* v. *Stimson*, 223 U. S. 605; *Lane* v. *Watts*, 234 U. S. 525; *Payne* v. *Central Pac. Ry. Co.*, 255 U. S. 228; *School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94.

Where the Government has entered into a commercial enterprise for profit, it cannot retain its immunity from suit as a sovereign in a governmental capacity. *Bank of United States* v. *Planter's Bank*, 9. Wheat. 904; *Bank of Kentucky* v. *Wister*, 2 Pet. 318; *Briscoe* v. *Bank of Kentucky*, 11 Pet. 257; *Louisville R. R.* v. *Letson*, 2 How. 302; *South Carolina* v. *United States*, 199 U. S. 43; § 201 (e), Transportation Act, 1920.

The contract of lease and option to purchase is not a contract with the Government of the United States in

.its sovereign capacity. The District Court had discretionary jurisdiction to grant the temporary injunction, and with this discretion the Court of Appeals should not have interfered. *Denver & Rio Grande R. R. v. United States,* 124 Fed. 146; *Stearns Rogers Mfg. Co.* v. *Brown,* 114 Fed. 939.

The decision of the court below deprives the petitioner of his property without due process of law. Clause eight of the contract is not a forfeiture provision granting to the Secretary of War, who is not designated therein, the power to terminate the contract, at his discretion, in an unwarranted and arbitrary manner, and thereby seize the property of the petitioner. *Shipping Board Cases,* 258 U. S. 549; 6 R. C. L. 906, § 291; 3 Story, Eq. Juris; ch. XXXVII, 14th ed., 1918, § 1728; *Phil. W. & B. R. Co.* v. *Howard,* 13 How. 307; *Hartman* v. *C. B. & Q. R. R. Co.,* 192 Mo. App. 271; *United States* v. *U. S. Engineering Co.,* 234 U. S. 236; *Dist. of Columbia* v. *Camden Iron Wks.* 181 U. S. 455; *Cheney* v. *Libby,* 134 U. S. 69; *United States* v. *Peck,* 102 U. S. 64; *United States Harness Co.* v. *Graham,* 288 Fed. 929.

*Mr. Lon. O. Hocker,* Special Assistant to the Attorney General, with whom *Solicitor General Mitchell, Assistant Attorney General Letts,* and *Mr. J. Frank Staley,* Special Assistant to the Attorney General, were on the briefs, for respondents.

Mr. CHIEF JUSTICE TAFT prepared the opinion of the Court.*

This was a suit in equity brought in the United States District Court for the Eastern District of Missouri, and reaches here from the Circuit Court of Appeals for the

---

* MR. JUSTICE HOLMES announced the opinion, the CHIEF JUSTICE being absent.

Eighth Circuit by certiorari.  The general purpose of the bill filed by Edward F. Goltra, petitioner here, was to enjoin the seizure of a fleet of towboats and barges on the Mississippi River which had been held by him as lessee. It charged that the Secretary of War, the Chief of Engineers, and Colonel T. Q. Ashburn, Chief, Inland and Coastwise Waterways Service, were engaged in a conspiracy unlawfully to deprive him of the boats.  He sought to enjoin the threatened seizure of them and to have those of them which had already been taken restored to his possession.

The lease to Goltra was made May 28, 1919, by General Black, Chief of Engineers, as the lessor, by direction of the Secretary of War, acting for the United States.  It leased nineteen barges nearing completion, and three or four towboats not yet constructed, for a term of five years from the date the first towboat or barge was delivered to the lessee.  The lessee covenanted to operate as a common carrier the whole fleet, on the Mississippi River and its tributaries, for the period of the lease and of any renewals thereof, transporting iron ore, coal and other commodities at rates not in excess of the prevailing rail tariffs, and at not less than the prevailing rail tariffs without the consent of the Secretary of War.  The lessee was to pay all operating expenses of the fleet, and to maintain during the term each towboat and barge of the fleet in good operating condition to the satisfaction of the lessor. The salvage earned by any of the fleet was to be for the benefit of the United States, after deducting expenses. The net earnings above operating expenses and maintenance for each ton of cargo were to be turned over by the lessee to the Secretary of War every ninety days, for deposit to his credit in the Treasury, until the net earnings equalled the full amount of the cost of the several vessels, plus interest on the cost of 4 per cent. per annum; and

then for deposit in St. Louis banks, to be held for the fulfillment of the terms of the lease. The lessee was to keep accurate detailed accounts of all tonnage moved and all moneys received and his operating expenses, subject to the inspection of the lessor or his representatives, and the overhead expenses were to be subject to the approval of the lessor, and any items objected to were to be referred to the Secretary of War, whose decision was to be final. Within three months prior to the expiration of the lease, or of any period of renewal, or sooner if so desired by the lessee, a board was to appraise the value of the fleet and the lessee was given the option of purchasing the fleet by the fund from the net earnings and by fifteen promissory notes running for fifteen years, the title of the property to remain in the United States until the payment of the whole of the purchase price of the property.

Section 8 of the lease, the important provision in this case, reads as follows:

" The lessor reserves the right to inspect the plant, fleet, and work at any time to see that all the said terms and conditions of this lease are fulfilled, and that the crews and other employees are promptly paid, monthly or oftener; and non-compliance, in his judgment, with any of the terms or conditions will justify his terminating the lease and returning the plant and said barges and towboats to the lessor, and all moneys in the Treasury or in bank to the credit of the Secretary of War shall be deemed rentals earned by and due to the lessor for the use of said vessels."

There was a supplemental agreement in 1921, approved by the Secretary of War, made by Lansing H. Beach, the Chief of Engineers, who had then succeeded Chief of Engineers Black. This made provision for the construction of additional facilities for the use of the fleet and brought them within the terms of the original contract.

The bill set out that there was delay in the construction and delivery of the fleet, and that both parties after

the war found difficulty in performing their undertakings; that, after the making of the lease, the plaintiff had secured a good many contracts for the shipment of commodities of different kinds—of oil from New Orleans to Illinois, coal from Kentucky to St. Louis, manganese from New Orleans to St. Louis; that the rate which he arranged for was 80 per cent. of the prevailing rail rate; that, when he applied to the Secretary of War, he could not obtain permission to transport some of his commodities at a proper rate; that conditions were imposed requiring the consent of officers in charge of the Mississippi Warrior, another enterprise of the Government, to Goltra's rate, and that by reason thereof it was impossible for him to operate as a common carrier; that by the acts of the Secretary of War the plaintiff was wrongfully prevented by the lessor from carrying out the terms and conditions of the contract that John W. Weeks and T. Q. Ashburn, named as defendants, acting in combination, wrongfully undertook to declare the contracts terminated, and, on March 3, 1923, demanded from the plaintiff the immediate posession of the boats without warrant of law, and wrongfully and unlawfully threatened to take them by force, caused some of the towboats and barges to be actually seized, and were threatening to take them all, and that unless restrained would do so; that the plaintiff had no adequate remedy at law for the redress of the wrongs complained of. He therefore asked a temporary restraining order to be granted immediately, and a restoration of the fleet to him, and a rule on the defendants to show cause why a temporary injunction should not issue. A rule to show cause was issued, March 25, 1923, on defendant.

It appeared that the whole fleet had been taken over by Colonel Ashburn under an order of the Secretary of War. The taking over was on Sunday, and there was a purpose on the part of Colonel Ashburn, anticipating an

injunction, to remove such of the fleet as were in St. Louis, across the river, to be out of the jurisdiction of the Missouri District Court. All of the defendants filed returns to the rule setting out defenses. A hearing was had on the motion for a temporary injunction, evidence was taken, and the District Court found that the fleet had been improperly seized and should be restored to the plaintiffs, and the defendants be enjoined from any attempt to resume possession until a final hearing of the case.

The defendants then sought a writ of prohibition out of this Court to prevent the further consideration of the cause by the District Court. *Ex parte United States,* 263 U. S. 389. The leave to file a petition for prohibition was denied, on the ground that the remedy by appeal from the District Court was adequate.

The evidence shows that, in March, 1921, Goltra applied to have his rates as a common carrier fixed at 80 per cent. of the prevailing rail rates, and he was allowed from that time on until March, 1922, to make those rates. In March, 1922, the Secretary of War notified him that he could not approve any operation on the lower Mississippi entering into competition with the Government Mississippi Warrior line, and that he could not approve an 80 per cent. rate there. In April, 1922, Goltra objected to the limitation, saying that he had obligated himself to transport coal from Kentucky and manganese and oil from New Orleans at this rate. Thereupon the Secretary of War advised him that the rate on the lower Mississippi must be raised from 80 per cent. to 100 per cent. of the rail tariffs, for the future, thus allowing him to complete the contracts of transportation already entered into, of which he had written. By letter of May 25, 1922, he was allowed a rate not less than 80 per cent. of the rail rates for many different commodities. The Secretary assured him that, if he decided to operate his boats on

the upper Mississippi, he was authorized to carry all commodities at not less than 80 per cent., and that the officers of the Warrior Service had been instructed to coöperate with him to the fullest extent in making his fleet a success.

After a year, on March 13, 1923, the Secretary of War, in view of the little use he had made of the fleet, sent the following notice to Goltra:

" Pursuant to the right reserved in paragraph eight of the contract dated May 28, 1919, and the supplement thereto dated May 26, 1921, between you and the United States, for the operation as a common carrier of a fleet of four towboats and nineteen barges, and the erection of unloading facilities, you are hereby notified that in my judgment you have not complied with the terms and conditions of said contract in that you have failed to operate the said towboats and barges as a common carrier and in other particulars.

" I therefore declare the said contract and the supplement thereto terminated. You are hereby directed upon the receipt of this notice immediately to deliver possession of the said towboats and barges, and any unloading facilities erected pursuant to the supplemental contract and paid for by funds of the United States, to Colonel T. Q. Ashburn, Chief Inland and Coastwise Waterways Service, who will deliver this notice, and who is instructed and authorized to receive and receipt for the property herein mentioned."

April 27, 1923, the Chief of Engineers sent a similar letter to Goltra. Goltra acknowledged receipt of the Secretary's letter, but protested against the action.

The Circuit Court of Appeals reversed the action of the District Court in restoring the fleet to Goltra and enjoining the defendants, and held that the motion to dismiss and to quash the temporary restraining order should have been granted, on the ground that the United States was a necessary party and could not be sued in such an action.

We can not agree with the Circuit Court of Appeals
that the United States was a necessary party to the bill.
The bill was suitably framed to secure the relief from an
alleged conspiracy of the defendants without lawful right
to take away from the plaintiff the boats of which by lease
or charter he alleged that he had acquired the lawful pos-
session and enjoyment for a term of five years.  He was
seeking equitable aid to avoid a threatened trespass upon
that property by persons who were government officers.
If it was a trespass, then the officers of the Government
should be restrained whether they professed to be acting
for the Government or not.  Neither they nor the Gov-
ernment which they represent could trespass upon the
property of another, and it is well settled that they may
be stayed in their unlawful proceeding by a court of com-
petent jurisdiction, even though the United States for
whom they may profess to act is not a party and can not
be made one.  By reason of their illegality, their acts or
threatened acts are personal and derive no official justi-
fication from their doing them in asserted agency for the
Government.  The point is fully covered by *Philadelphia
Company* v. *Stimson,* 223 U. S. 605.  In that case, the
complainant owned an island in the Ohio River around
which the duly authorized officers of Pennsylvania had
located a harbor line which by statute was declared to be
forever firm and stable.  The Secretary of War changed
the harbor lines in such a way as to cross the complain-
ant's land within the state harbor line which had never
been, as complainant alleged, part of the navigable waters
of the United States.  The bill averred that the Secretary
of War proposed to institute criminal prosecutions with
heavy penalties against complainant for his proposed erec-
tion of buildings on his own land.  It was objected on de-
murrer that this was a suit against the United States and
must be dismissed for lack of its presence as a party.
This Court declined to yield to the contention as a ground

for dismissing the bill. The ruling is so comprehensive and refers to so many authorities and is so apt that we quote the language at pages 619 and 620:

" If the conduct of the defendant constitutes an unwarrantable interference with property of the complainant, its resort to equity for protection is not to be defeated upon the ground that the suit is one against the United States. The exemption of the United States from suit does not protect its officers from personal liability to persons whose rights of property they have wrongfully invaded. *Little* v. *Barreme*, 2 Cranch, 170; *United States* v. *Lee*, 106 U. S. 196, 220, 221; *Belknap* v. *Schild*, 161 U. S. 10, 18; *Tindal* v. *Wesley*, 167 U. S. 204; *Scranton* v. *Wheeler*, 179 U. S. 141, 152. And in case of an injury threatened by his illegal action, the officer can not claim immunity from injunction process. The principle has been frequently applied with respect to state officers seeking to enforce unconstitutional enactments. *Osborn* v. *Bank of United States*, 9 Wheat. 738, 843, 868; *Davis* v. *Gray*, 16 Wall. 203; *Pennoyer* v. *McConnaughy*, 140 U. S. 1, 10; *Scott* v. *Donald*, 165 U. S. 107, 112; *Smyth* v. *Ames*, 169 U. S. 466; *Ex parte Young*, 209 U. S. 123, 159, 160; *Ludwig* v. *Western Union Telegraph Company*, 216 U. S. 146; *Herndon* v. *C., R. I. & P. Ry. Co.*, 218 U. S. 135, 155; *Hopkins* v. *Clemson College*, 221 U. S. 636, 643–645. And it is equally applicable to a federal officer acting in excess of his authority or under an authority not validly conferred. *Noble* v. *Union River Logging R. R. Co.*, 147 U. S. 165, 171, 172; *School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94.

" The complainant did not ask the court to interfere with the official discretion of the Secretary of War, but challenged his authority to do the things of which complaint was made. The suit rests upon the charge of abuse of power, and its merits must be determined accordingly; it is not a suit against the United States."

It is sought to avoid the application of this to the present case by reference to the later case of *Wells* v. *Roper,* 246 U. S. 335. We think it clearly distinguishable. Wells had a contract with the Postmaster General acting for the United States, by which Roper agreed for four years to furnish, for use in collecting and delivering the mail, automobiles and chauffeurs at a stipulated compensation. One provision of the contract was that any or all of the equipments contracted for might be discontinued at any time upon ninety days' notice by the Postmaster General. Later, Congress authorized that official in his discretion to use an appropriation to buy and maintain automobiles for operating an experimental combined screen wagon and city collection and delivery service, and, in order to do this, he deemed it necessary to discontinue the service of the plaintiff, and gave the latter seasonable notice of the cancellation of the contract. · The suit was a bill in equity to enjoin the Postmaster General from annulling the contract and interfering between the United States and the plaintiff in the performance and execution of the contract. The bill was dismissed on the ground that it was a suit against the United States. That which the bill sought to restrain was not a trespass upon the property of the plaintiff. The automobiles of the plaintiff were not to be taken away from him by the government officer. What the officer was doing was merely exercising the authority entrusted to him by law for the benefit of the Government in annulling a contract which involved no change of possession or title to property. To enjoin the officer's action was in effect enforcement by specific performance of a contract against the United States. It was an affirmative remedy sought against the Government which, though in form merely restrictive of an officer, was really mandatory against the sovereign. The difference between an injunction against the illegal seizure of property lawfully possessed and against the cancellation of a contract which involved no change of possession is manifest.

As the United States was not a necessary party to the bill, the action of the Circuit Court of Appeals, in dismissing the bill and quashing the injunction for lack of its presence as such, can not be sustained.

Coming now to the merits, however, we think that the District Court erred in granting the temporary injunction, because, on the facts disclosed, the lease was finally terminated by the decision of the Secretary of War and the Chief of Engineers, communicated to Goltra under § 8 of the contract. It is very clear that, under that section, Goltra agreed that the lease should be terminated and that the plant and barges should be returned to the lessor, if the lessor decided that in his judgment there had been noncompliance with the terms and conditions of the lease. It appears from the evidence that during the season from July 15, 1922, when Goltra got the boats, they were not in use but were tied up except for the transportation of two comparatively small cargoes. The bill itself admits that Goltra did not fulfill his covenant to operate as a common carrier. He says he was prevented from doing so by the Secretary's refusal to give him the rates he wished. The contract expressly forbade rates exceeding the prevailing rail rates and forbade rates less than the rail rates except by consent of the Secretary.

The stipulation that the lessor, the Chief of Engineers, could terminate the lease if in his judgment Goltra was not complying with the obligations of the contract, did not require for its exercise that the Chief of Engineers, or the Secretary, should hold a court and have a hearing to determine the question of compliance. Goltra was given a notice, March 4th, of the termination. He answered, March 8th, but he tendered no facts upon which either the Secretary or the Chief of Engineers could base any different conclusion from that already reached from the failure of Goltra to fulfill his obligations. Both the

Secretary and the Chief of Engineers were fully advised of what Goltra did and did not do under the contract.

The cases leave no doubt that such a provision for termination of a contract is valid, unless there is an absence of good faith in the exercise of the judgment. Here, nothing of the kind is shown. Such a stipulation may be a harsh one or an unwise one, but it is valid and binding if entered into. It is often illustrated in government contracts in which the determination of a vital issue under the contract is left to the decision of a government officer. *Kihlberg* v. *United States,* 97 U. S. 398; *Sweeny* v. *United States,* 109 U. S. 618; *United States* v. *Gleason,* 175 U. S. 588; *United States* v. *Mason & Hanger Co.,* 260 U. S. 323; *United States* v. *Henley,* 182 Fed. 776; *Martinsburg R. R. Co.* v. *March,* 114 U. S. 549.

Nor does the circumstance that, as in this case, the lessor whose judgment is to prevail is a party to the contract alter the legal result. Of course the Chief Engineer is not the real party in interest. He is a professional expert, as such was designated as lessor, and is really acting only as an agent for the Government. But even if this were a stipulation between private individuals, judgment of one of the parties on such an issue would be, in the absence of bad faith, conclusive. There are many cases where the contract makes the satisfaction of one of the parties in respect of compliance the condition precedent to fulfillment, and good faith is all that is required to justify rejection of work or product tendered. Some of them present a convincing analogy to the case. In *Magee* v. *Scott &c. Lumber Co.,* 78 Minn. 11, the defendant made a contract with a Duluth tug owner to tow 7,000,000 feet of saw logs to its mill at Duluth from the north shore of Lake Superior. The contract contained a provision that, in case the services should not be satisfactory, the defendant reserved the privilege of terminating the contract at any time. The defendant terminated

the contract, because of plaintiff's delay.  The evidence being clear that the decision was honest, the court directed a verdict and the action was sustained by the Supreme Court.

Much has been said on behalf of the Government with reference to the special power of a government officer to act in such a case, and without judicial assistance forcibly to repossess himself of government property, which we might find it difficult to agree with but which it is unnecessary for us to consider.  Our conclusion is based on the law as it is administered between private persons.  Colonel Ashburn took possession without notification to Goltra other than that which had been communicated to him by the Secretary of War terminating the contract, and it is clear from the evidence that Colonel Ashburn was anxious to take possession of the property before a writ of injunction could be sued out by Goltra, and that he sought to take the fleet out of the jurisdiction of the court where he feared the injunction.  He was not directed to make the seizure by the Secretary of War against the opposition of Goltra, but in such case he was directed to resort to legal proceedings.  He stands upon the statement that he took possession without violence and therefore was rightly in possession when the order of the court was served.  He took possession, whether he took it violently or not.  Concede that he did it with a show of force which was coercive.  Concede that it was a seizure without process, and wrong.  But even so, an injunction looks only to the future.  At the hearing it was made plain that Goltra was not entitled to the possession, and the court—one of equity—would not go through the idle form of restoring the property to Goltra by way of correcting the Colonel's wrong, and then requiring a redelivery to the lessor.

As it is, the court has taken over the fleet and given it to Goltra under bond, and the only issue that remains is whether the injunction and the restoration should be

maintained or the injunction be dissolved and the fleet returned to the lessor.

On an appeal from a temporary injunction it often happens that, where there is a balance of convenience and doubt as to the issue, the *status quo* under the restraining order and the restoration should be maintained until a final hearing; but in this case, in the court hearing it, the issue was fully treated as if on final hearing. The right of the lessor to take over the fleet under § 8 of the contract, unless there was fraud in the judgment of termination by the Chief of Engineers, the lessor, of which we have found no evidence, is clear. We think, therefore, the injunction should be dissolved and the fleet restored to the lessor.

The claim that the petitioner has been deprived of his property without due process of law has no substance as a reason for sustaining the temporary injunction appealed from. He has had, and is having, due process in this very proceeding, and, on that issue, the decision must go against him whether the taking possession of the boats by Colonel Ashburn was warranted or not.

If Colonel Ashburn committed a breach of the peace or illegally injured any person in his taking possession, he is responsible to proper authority and to the person injured; but that does not affect the rights of the lessor under this lease or the vindication of them in this review.

The reversal of the injunction of the District Court by the Circuit Court of Appeals is affirmed, and the cause is remanded to the District Court for further proceedings in conformity with this opinion.    *Affirmed.*

---

The separate opinion of Mr. Justice McReynolds.

Theoretically, everybody in this land is subject to the law. But of what value is the theory if performances like those revealed by this record go unrebuked?

An army officer, having inflated himself into judge and executioner, decided that a fleet of towboats and barges lying in the Mississippi River at St. Louis ought no longer to remain in the custody of a private citizen who held possession of them under a solemn lease and contract of sale from the United States and who, in order to make them operative, had expended upon them forty thousand dollars of his own money. Then, waiting until a Sunday arrived, he proceeded to grab the vessels by force and endeavored to run them beyond the jurisdiction of the court.

Action like that is familiar under autocracies, but the prevalent idea has been that we live under a better system.

The trial court, after taking an ample indemnifying bond, issued a temporary injunction requiring that possession of the vessels be restored and remain as before the seizure until the rights of all parties could be properly considered and determined. The Circuit Court of Appeals reversed this interlocutory order, and from its decree the cause came here by certiorari.

As a fitting climax to the high-handed measures pursued by the officer, special counsel for the United States appeared at our bar and gravely announced—"Where the executive power has pronounced its finding or judgment within its proper sphere of action, a judicial judgment is not necessary to the enforcement of the executive one, for the reason that all the compulsive power of the government is in the executive department and may be exercised by it in execution of its own processes and judgment, just as it is exercised by it in the execution of judicial process and judgment."

It is easy enough for us to smile at such stuff, but, unfortunately, the evil effects are not dissipated by gentle gestures. There should be condemnation forceful enough to prevent repetition so long as men have eyes to read.

In the Circuit Court of Appeals Judge Sanborn presented a well-considered dissenting opinion and pointed out that the only judicable question before that court was whether or not the order for the injunction and the record disclosed an unlawful, improvident or abusive use of the sound discretion which the trial judge was required to exercise. 7 Fed. (2d) 838, 851; and see *Ex parte United States,* 263 U. S. 389. He could find no such abuse, and neither can I. The trial court did no more than the circumstances permitted. We should approve its action with commendation of the impelling courage and good sense.