**PRATT CHUCK CO. v. CRESCENT IN-SULATED WIRE & CABLE CO., Inc.**

Circuit Court of Appeals, Second Circuit.
June 10, 1929.

No. 325.

Robert B. Honeyman, of New York City, for appellant.

James F. Hubbell and Miller & Hubbell, all of Utica, N. Y., for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). ■ Upon the former appeal we held that title to the machines had not passed, even though the buyer's rejection was wrongful. We said that the contract contemplated some acceptance by the buyer after the test was made, and that, whatever the wrong, they remained the property of the seller until so accepted. We expressly reserved the question whether the buyer might refuse, if not satisfied that the performance at Trenton was as good as that at Oneida. Apparently the learned

judge supposed that we had said that he must be, and so disposed of the case. In so doing he charged the jury that the buyer's refusal might be so arbitrary as to constitute "legal bad faith," but he declined to say that, no matter how arbitrary the refusal, the seller had not performed unless the rejection was a "fraud." If the judge meant that the refusal might be so unwarranted by the facts that there was no conclusion possible, except that the buyer had in fact been satisfied, no harm was done, though it was awkward and misleading language, because "arbitrary" has very different connotations. Moreover, there was no reason in that case for speaking of "legal bad faith" at all. The seller performed only in case the buyer in fact believed that the performance was the same in Trenton and Oneida. Goltra v. Weeks, 271 U. S. 536, 548, 46 S. Ct. 613, 70 L. Ed. 1074; Thompson-Starrett Co. v. La Belle Iron Works, 17 F.(2d) 536 (C. C. A. 2). The jury was not told this, and the charge was incorrect, if the buyer had reserved an uncontrolled right to reject.

However, we do not think that he had. The parties had established a standard of performance, and the buyer's freedom was at most limited to his opinion as to whether the performance at Trenton equaled that at Oneida. True, that judgment might have been left finally to him, and so it was as to the passage of title. It is quite another matter to say that he was under no obligation to accept. The adverb "satisfactorily" by no means requires such a construction, and the power so accorded is not to be lightly imputed; it is a drastic provision. The results at Oneida were stated in terms of breaks in four "coils" sent by the defendants. It is, indeed, possible that these were not intended as the sole test; but it was natural for the plaintiffs so to assume. This was all that the defendants knew, or could have known, for they had no one there at the time; if the language meant anything, it is hard to see what else it could be. Breaks are subject to exact determination, unlike the impalpable considerations which determine the acceptability of a painting, a house, or even a factory. To construe such language as permitting the buyer to say that, in the face of demonstrable evidence covering the only issue left open, he reserves the power to reject, seems to us too improbable to be entertained. The charge did therefore leave the essential issue to the jury, and indeed was more favorable to the buyer than he was entitled to.

■ The evidence was enough to make an issue. The standard length of armored coils of electric cable is 250 feet, and shorter lengths have to be sold at a reduced price. On November 26th, 5 coils were made in one machine, 6 in another, and 7 in the other two, 25 in all. There were four breaks in the output of each of two machines, two in another and none in the fourth. In every case the breaks were due either to the plugging of the die by the zinc galvanizing which it scraped off the "strip," or to the failure of a weld, because it was too thick to run through the die, or to a loose end in the "strip." Such at least was Swetmon's testimony, and, if the jury took it, it showed that the breaks were not the fault of the machines. However, since, as we have said, the parties had fixed as a standard the performance of the machines at Oneida, unless the seller met it at Trenton, he had not performed, whether the fault was of the "strip" or not. He had asked the buyer to send to his factory a coil of "poor," and a coil of "average" "strip," and the seller had sent four coils not identified until the trial, of which in fact two were scrap and two were good. One of the scrap coils showed extremely poor results, the other a break and a "split," which makes a break; one of the good coils showed no breaks, the other, one. If the performance at Trenton is compared with what was done at Oneida with the good coils, it was not so good; if it is compared with the average on the four coils, it was better. The breaks come from the clogging of the dies when the zinc galvanizing is scraped off, which depends, at least in part, upon how well it is put on, from lap welds which thicken the strip, or from "splits," a defect in the steel. The standard was as to how well the machines would handle these imperfections, and it in part depended upon how many of these there were in the "strip." When the buyer assented to the results at Oneida, it appears to us that the seller could only have concluded that they were to be used as an average, and that the buyer so understood it.

■ He insists, however, that even so the seller did not perform, because Swetmon gave no notice to Murray of the test, and because two of the machines were not operated at all. As to the first, it is true that on the 22d Murray had told Swetmon to get ready the two machines, and to tell him when the test was to be made. But he coupled this with the condition that all six should be run by his own workmen, though under Swetmon's supervision, and this was contrary to the express terms of the contract. Swet-

mon did advise the foreman, who was in charge of this part of the factory, and he refused to take any part in the run, except when called over to look at defects in the "strip." We of course agree that the buyer was entitled to notice, but it seems to us from these circumstances that a jury might conclude that the test which Swetmon proposed to make, and had the right to insist upon, Murray would have declined to accept. At least they might think that it absolved Swetmon of Murray's demand to be notified, in the absence of which notice to the foreman was enough. Moreover, when the foreman refused to watch the run, Swetmon could only have concluded that the buyer was not interested in what he proposed to do. We do not read Murray's letter of December 14th as complaining of this failure, except in conjunction with his demand that his own men should operate.

The same considerations in general dispose of the failure to run the two machines. Swetmon had asked for the missing parts, and had been in Trenton over three weeks trying to put the machines in order, due as far as can be ascertained to the buyer's treatment of them. Murray had, as we have said, demanded that all be included; but he did nothing effective to co-operate. How long was Swetmon to wait? It was not his fault that they would not work; after giving time enough to supply the parts, we think he was justified in proceeding as best he could. The jury had some basis for finding the seller's default in performance excused.

█ A more serious question arises, however, as to the right of action. Subdivision 3 of section 144 of the New York Personal Property Law (Consol. Laws, c. 41) cut down the seller's remedy as it had long existed in New York (Bement v. Smith, 15 Wend. [N. Y.] 493; Dustan v. McAndrew, 44 N. Y. 72), though not in England (Atkinson v. Bell, 8 B. & C. 277). In New York, upon the buyer's rejection, he formerly might sue for the price without condition; now it must appear that the goods are not readily resalable, and that he has advised the buyer that he is holding the goods as his bailee. In the case at bar the goods were certainly not readily resalable, but as certainly the seller did not hold them as the buyer's bailee, for he had no possession of them. He had delivered them, and, although the buyer refused to accept them, they remained in his possession. To comply with the letter, it would have been necessary for the seller to accept the buyer's offer to return, and then to advise him that the goods would be held for him as bailor. Instead, the seller refused to receive them back, and so the matter rested. This makes no difference in substance. The remedy is really a specific performance of the contract. Fisher Hydraulic, etc., Co. v. Warner, 233 F. 527 (C. C. A. 2); Manhattan, etc., Co. v. General Electric Co., 226 F. 174 (C. C. A. 8); Williston on Sales §§ 563, 565, 567. Whatever were the theoretical objections to the old New York rule, it has now been put upon a sound basis by limiting it to cases where damages are not an adequate remedy. But, if so, it cannot be argued that the seller puts himself out of court, when by an actual delivery he goes further in performance than if the goods still remained in his possesssion. The situation is more favorable to the buyer than that literally prescribed; he has his goods, and need not depend upon the seller's delivery. While, so far as we can find, the point has never arisen, we think that the intimation which we gave before was well founded, and that the statute covers such a case.

Judgment affirmed.