**HUDSPETH COUNTY CONSERVATION & RECLAMATION DIST. NO. 1 et al.**

v.

**ROBBINS et al.**

No. 14668.

United States Court of Appeals
Fifth Circuit.

May 27, 1954.

W. Morgan Hunter, Austin, Tex., Theodore Andress, El Paso, Tex., Thurmond Arnold, Washington, D. C., Arnold, Fortas & Porter, Washington, D. C., Andress, Lipscomb & Peticolas, El Paso, Tex., Powell, Wirtz & Rauhut, Austin, Tex., of counsel, for appellants.

Eugene T. Edwards, Louis A. Scott, El Paso, Tex., Frederick K. Gray, Regional Counsel, U. S. Bureau of Reclamation, Amarillo, Tex., for appellee.

Before HUTCHESON, Chief Judge, and HOLMES and RIVES, Circuit Judges.

RIVES, Circuit Judge.

Appellant, Hudspeth County Conservation and Reclamation District No. 1, a Texas public corporation, and five individual land owners, as representatives of all of the land owners of the Hudspeth District, as plaintiffs, brought this suit against the Regional Director and Assistant Regional Director of the Bureau of Reclamation, the Project Manager and Assistant Project Manager of the Rio Grande Reclamation Project, thirteen in-dividuals as representatives of all land owners and water users of the Rio Grande Project, El Paso County Water Improvement District No. 1, another Texas public corporation, and the Manager of said corporation, as defendants.[1] Plaintiffs sought a declaratory judgment to establish certain water rights of the Hudspeth land owners, and in order to protect such water rights, they sought an injunction against the officials of the Federal Bureau of Reclamation named as defendants, their successors in office, agents and employees. This appeal is by the plaintiffs from a summary judgment rendered by the district court in favor of the defendants and its refusal to render a partial summary judgment for the plaintiffs.

While the district court thus ruled with the defendants on the merits, it had overruled their motion to dismiss the action on the ground that the United States, which has not consented to be sued, is an indispensable party defendant. That question, going to the jurisdiction of the district court, confronts us at the outset. We shall therefore briefly outline some of the essential facts and restate the plaintiffs' contentions sufficiently for a consideration of that jurisdictional issue.

Elephant Butte Dam and Reservoir and Caballo Dam and Reservoir are integral parts of a reclamation project known as the Rio Grande Project, which was undertaken and constructed by the Government under authority of the Reclamation Act of June 17, 1902, 32 Stat. 389, 43 U.S.C.A. § 371 et seq.[2] In 1906

---

1. For convenience the parties will usually be referred to as plaintiffs and defendants.

2. An Act of February 25, 1905, 33 Stat. 814, provides as follows:
"That the provisions of the Reclamation Act approved June seventeenth, nineteen hundred and two, shall be extended for the purposes of this Act to the portion of the State of Texas bordering upon the .

Rio Grande which can be irrigated from a dam to be constructed near Engle, in the Territory of New Mexico, on the Rio Grande, to store the flood waters of that river, and if there shall be ascertained to be sufficient land in New Mexico and in Texas which can be supplied with the stored water at a cost which shall render the project feasible and return to the rec-

and 1908, the Federal Reclamation Service filed notices of intent to appropriate all the unappropriated waters of the Rio Grande River.[3] The dams, reservoirs and irrigation works were completed to a point where, under date of November 19, 1924, Commissioner Mead of the Bureau of Reclamation wrote to the Secretary of Interior in part, as follows:

"The Hudspeth County Conservation and Reclamation District No. 1 contains an irrigable area of 20,014 acres located in the State of Texas just below the Rio Grande Federal irrigation project. The terminus of the Tornillo Main Canal of the Government project may be feasibly connected with the district canal to serve water to lands of the district. The United States will have available for disposal at the terminus of this canal certain water developed from the project, which water can be used for the irrigation of district lands. This water would be dumped into the river and lost to the project were it not utilized on lands in the Hudspeth District."

Under date of December 1, 1924, a contract was entered into between the United States of America and Hudspeth County Conservation and Reclamation District No. 1, which contract recognized that "the District contains an irrigable area of 20,014 acres located in Texas just below the Rio Grande Federal Irrigation Project." That contract provided in part, as follows:

"The United States will deliver to the District at the terminus of the

---

lamation fund the cost of the enterprise, then the Secretary of the Interior may proceed with the work of constructing a dam on the Rio Grande as part of the general system of irrigation, should all other conditions as regards feasibility be found satisfactory."

3. As illustrative of both notices, we quote part of the 1908 notice, as follows:

"The United States acting under authority of an Act of Congress, known as the Reclamation Act, approved June 17, 1902, 32 Stat. 388, proposes to construct within the Territory of New Mexico certain irrigation works in connection with the so-called Rio Grande Project. The operation of the works in question contemplates the diversion of the water of the Rio Grande River.

"Section 40 of Chapter 49 of the laws enacted in 1907 by the 37th Legislative Assembly of the Territory of New Mexico, an Act entitled, 'An Act to conserve and regulate the use and distribution of the waters of New Mexico; to create the office of Territorial Engineer; to create a Board of Water Commissioners, and for other purposes,' approved March 19, 1907, reads as follows:

" 'Whenever the proper officers of the United States authorized by law to construct works for the utilization of waters within the Territory, shall notify the Territorial Engineer that the United States intends to utilize certain specified waters, the waters so described, and unappropriated, and not covered by applications or affidavits duly filed or permits as required by law, at the date of such notice, shall not be subject to a further appropriation under the laws of the Territory for a period of three years from the date of said notice, within which time the proper officer of the United States shall file plans for the proposed work in the office of the Territorial Engineer for his information, and *no adverse claim to the use of the water required in connection with such plans, initiated subsequent to the date of such notice, shall be recognized under the laws of the Territory*, except as to such amounts of water described in such notice as may be formally released in writing by an officer of the United States thereunto duly authorized; Provided, that in case of failure to file plans of the proposed work within three years, as herein required, the waters specified in the notice given by the United States to the Territorial Engineer shall become public water, subject to general appropriations.'

"In pursuance of the above statute of the territory you are hereby notified that the United States intends to utilize the following described waters, to-wit:

"All the unappropriated water of the Rio Grande and its tributaries, said water to be diverted or stored from the Rio Grande River at a point described as follows:

"Storage dam about nine miles west of Engle, New Mexico, with capacity for two million (2,000,000) acre feet, and diversion dams below the Palomas, Rincon, Mesillas and El Paso Valleys in New Mexico and Texas."

Tornillo Main canal, during the irrigation season of 1925 and thereafter during each irrigation season as established on the Rio Grande project, such water from the project as may be available at said terminus without the use of storage from Elephant Butte reservoir. The Secretary of the Interior shall be at all times the sole judge of the availability of such water. The rental of water hereunder is secondary and inferior to the right to use water for any purpose on the lands of the Rio Grande Federal irrigation project. In consideration of such rental the District hereby relinquishes all right, title, interest, and claim to any and all waters of the Rio Grande, except as herein provided."

An amendatory contract was entered into on April 27, 1951, which also contained the provision that "the rental of water hereunder is secondary and inferior to the right to use of water on the Rio Grande Federal Irrigation Project for any purposes." Indeed, some such provision was required by Section 1 of the Warren Act, Act of February 21, 1911, 36 Stat. 925, 43 U.S.C.A. § 523, authorizing carriage of water through reclamation facilities to independently operated irrigation districts "preserving a first right to lands and entrymen under the project".

Pursuant to these contracts, the defendant Reclamation officials and their predecessors carried water to the Hudspeth District from 1925 to 1951, and the land owners of the District used the water for irrigation purposes. Beginning in 1951, the defendant Reclamation officials have cut off deliveries of water to Hudspeth District, and some of the water so intercepted has been delivered to some farmers in El Paso and Elephant Butte Districts whose beneficial use of water is subsequent in time to that of the plaintiff Hudspeth farmers.

As their first and principal contention, the plaintiffs insist that by lawful, beneficial use of the Rio Grande water on Hudspeth lands appropriative water rights became vested as an appurtenance to such lands which cannot be limited or affected by contract with the Reclamation Bureau. That issue concerns rights to the use of water delivered to the Hudspeth District by the Reclamation officials under the contract executed in 1924 and amended in 1951.

■ A second and subordinate issue concerns seepage waters from lands in the El Paso District. It was necessary to drain lands in the El Paso District to keep them from becoming waterlogged. The drain water was not very desirable because of its saline character, and prior to 1951 the El Paso District made no use of these seepage waters. In 1947 a canal was constructed from the project drain outlet to the Hudspeth main canal system whereby such seepage waters might be carried directly to the Hudspeth system without discharge into the river. These drainage waters did not originally come under the 1924 contract but were included under the provisions of the amendatory contract of 1951, whereby the United States agreed to deliver such water as may be available through the distribution facilities carrying the drain or return flow waters into the Hudspeth District. The seepage waters, as well as the waters delivered to the Hudspeth District by Reclamation officials under the contract executed in 1924, were all developed waters of the Rio Grande Project made possible by that project and never received by the Hudspeth District prior to the construction by the Government of the dams, reservoirs and irrigation works. The right of the United States as storer and carrier was not exhausted when these waters had been once used, but, as recognized in the 1951 contract, that right extended to the recapture and re-use of such waters. State of Nebraska v. State of Wyoming, 325 U.S. 589, 615, 65 S.Ct. 1332, 89 L.Ed. 1815, note 11.

As a third issue, the plaintiffs claim that the defendant Reclamation officials unlawfully diverted and used water for generation of hydroelectric power in derogation of the prior and superior water

rights of the Hudspeth farmers and that the District Judge should have permitted the plaintiffs to amend their pleadings to pray for injunctive relief against such diversions.[4] In connection with the irrigation of lands, the Reclamation Act, 36 Stat. 930, 43 U.S.C.A. § 522, provides for the development and lease of surplus power or power privileges with the proviso "that no lease shall be made of such surplus power or power privileges as will impair the efficiency of the irrigation project".

■ The authority of the United States to construct, maintain and operate the dams, reservoirs and irrigation facilities is unquestioned. One of the purposes is to fulfill a treaty obligation to the Republic of Mexico.[5] Another purpose is to irrigate certain arid lands in New Mexico and Texas and thus to promote the general welfare.

"* * * the power of Congress to promote the general welfare through large-scale projects for reclamation, irrigation, or other internal improvement, is now as clear and ample as its power to accomplish the same results indirectly through resort to strained interpretation of the power over navigation." United States v. Gerlach Live Stock Co., 339 U.S. 725, 738, 70 S.Ct. 955, 962, 94 L.Ed. 1231.

The plaintiffs' position on all three contentions seems to be that the actions of the defendant Reclamation officials are ultra vires their statutory authority and,

therefore, may be made the object of injunctive relief. That position is based upon the contention that the Hudspeth land owners had acquired rights to use the water for irrigating their lands which were vested property rights appurtenant to their lands and wholly distinct from the interest of the Government in the irrigation works.

■ It seems clear that the United States, by filing the notices of intent to appropriate and thereafter impounding the water, did not become the owner of the water in its own right. That is recognized in the Reclamation Act itself, Section 8 of which provides, 32 Stat. 390, 43 U.S.C.A. § 372:

"*Water right as appurtenant to land and extent of right.* The right to the use of water acquired under the provisions of the reclamation law shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right."

A further provision of Section 8 of the Act is brought forward as 43 U.S.C.A. § 383:

"*Vested rights and State laws unaffected by chapter.* Nothing in sections 372, 373, 381, 383, 391, 392, 411, 416, 419, 421, 431, 432, 434, 439, 461, 491 and 498 of this title shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appro-

---

4. This contention is clearly explained in the appellants' brief as follows:
   "The diversions for power are brought about in this way. Caballo Dam was completed about 20 miles downstream from Elephant Butte Dam in 1938. At the same time a power house and power generation facilities were constructed at Elephant Butte Dam. The practice of the defendant Reclamation officials is to release water from Elephant Butte Dam, thereby generating hydroelectric power at the Elephant Butte facilities, and catch the waters so released in Caballo Reservoir, whence they are subsequently released for irrigation as needed. But the result of this practice is to spread out

over two reservoirs the waters which would otherwise have been confined in only one reservoir.
   "The spreading out of impounded waters over the area of two reservoirs causes much greater losses through evaporation and seepage than would result if the water were impounded in only one reservoir."

5. By the Convention of May 21, 1906, between the United States and Mexico, 34 Stat. 2953, the United States is obligated to deliver to Mexico at Juarez 60,000 acre feet of water annually from the Rio Grande, with proportionate diminution of this amount in case of accident or extreme drought.

priation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of such sections, shall proceed in conformity with such laws, and nothing in such sections shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof."

Accordingly, it was said in Ickes v. Fox, 300 U.S. 82, 94, 95, 57 S.Ct. 412, 416, 417, 81 L.Ed. 525, and quoted in State of Nebraska v. State of Wyoming, 325 U.S. 589, 614, 65 S.Ct. 1332:

"Although the government diverted, stored, and distributed the water, the contention of petitioner that thereby ownership of the water or water rights became vested in the United States is not well founded. Appropriation was made not for the use of the government, but, under the Reclamation Act, for the use of the landowners; and by the terms of the law and of the contract already referred to, the water rights became the property of the landowners, wholly distinct from the property right of the government in the irrigation works. Compare Murphy v. Kerr (D.C.) 296 F. 536, 544, 545. The government was and remained simply a carrier and distributor of the water (Id.), with the right to receive the sums stipulated in the contracts as reimbursement for the cost of construction and annual charges for operation and maintenance of the works."

Plaintiffs insist that the decision in Ickes v. Fox, supra, is determinative to the effect that the United States is not an indispensable party defendant. There Mr. Ickes, Secretary of the Interior, made the same contention and the Court in answering it said:

"The fallacy of the contention is apparent, because the thus-far undenied allegations of the bill, as already appears, demonstrate that respondents have fully discharged all their contractual obligations; that their water rights have become vested; and that ownership is in them and not in the United States. The motion to dismiss concedes the truth of these allegations; but even if they were denied, we should still be obliged to indulge the presumption, in favor of the jurisdiction of the trial court, that respondents might be able to prove them. United States v. Lee, 106 U.S. 196, 218, 219, 1 S.Ct. 240, 27 L.Ed. 171; cf. Tindal v. Wesley, 167 U.S. 204, 213 et seq., 17 S.Ct. 770, 42 L.Ed. 137. * * *

"The suits do not seek specific performance of any contract. They are brought to enjoin the Secretary of the Interior from enforcing an order, the wrongful effect of which will be to deprive respondents of vested property rights not only acquired under Congressional acts, state laws and government contracts, but settled and determined by his predecessors in office. That such suits may be maintained without the presence of the United States has been established by many decisions of this court, of which the following are examples: Noble v. Union River Logging R. Co., 147 U.S. 165, 171, 172, 176, 13 S.Ct. 271, 37 L.Ed. 123; Philadelphia Co. v. Stimson, 223 U.S. 605, 619, 32 S.Ct. 340, 344, 56 L.Ed. 570; Goltra v. Weeks, 271 U.S. 536, 544, 46 S.Ct. 613, 615, 616, 70 L.Ed. 1074; Work v. [State of] Louisiana, 269 U.S. 250, 254, 46 S.Ct. 92, 94, 70 L.Ed. 259; Payne v. Central Pacific Ry. Co., 255 U.S. 228, 238, 41 S.Ct. 314, 65 L.Ed. 598. These decisions cite other cases to the same effect. The recognized rule is made clear by what is said in the Stimson Case:

" 'If the conduct of the defendant constitutes an unwarrantable interference with property of the complainant, its resort to equity for protection is not to be defeated upon the

ground that the suit is one against the United States. The exemption of the United States from suit does not protect its officers from personal liability to persons whose rights of property they have wrongfully invaded. * * * And in case of an injury threatened by his illegal action, the officer cannot claim immunity from injunction process. * * *

" 'The complainant did not ask the court to interfere with the official discretion of the Secretary of War, but challenged his authority to do the things of which complaint was made. The suit rests upon the charge of abuse of power, and its merits must be determined accordingly; it is not a suit against the United States.' " 300 U.S. at pages 96–97, 57 S.Ct. at page 417.

An important distinction, we think, is that the plaintiffs in that case were land owners within the Yakima Reclamation Project and not Warren Act contractors, as here.[6] It may be that in the Ickes v. Fox case, supra, the Secretary's acts were so clearly in excess of his statutory authority as to be ultra vires, but that is not true here where the officials are acting under the provisions both of the Warren Act, 43 U.S.C.A. § 523, and of the contracts to preserve a first right to lands under the project. Again in Larson v. Domestic & Foreign Corp., 337 U.S. 682, 702, 69 S.Ct. 1457, 1467, 93 L. Ed. 1628, n. 26, it is noted that the

ground for decision in Ickes v. Fox, supra, is not altogether clear:

"The ground for decision in Ickes v. Fox is not altogether clear. The argument was made in that case that the Secretary of the Interior had no statutory power to overrule a determination of the rights of the plaintiffs made by his predecessor in office. 300 U.S. at page 86, 57 S.Ct. [412] at pages 413, 417, 81 L.Ed. 525. The tortious injury to the plaintiffs was also argued, in reliance on Goltra v. Weeks, as a basis for avoiding the sovereign's immunity. The Court appears to have relied on both grounds without indicating which was controlling. It said: 'The suits * * * are brought to enjoin the Secretary of the Interior from enforcing an order, the wrongful effect of which will be to deprive respondents of vested property rights not only acquired under Congressional acts, state laws and government contracts, but *settled and determined by his predecessors in office*' (emphasis added). [Id. at pages 96–97, 57 S.Ct. 412]. In support of the conclusion that the suit could be maintained, the Court relied first on Noble v. Union Logging R. Co., 1893, 147 U.S. 165, 13 S.Ct. 271, 37 L.Ed. 123, a decision resting entirely on the officer's lack of statutory power to overrule the decision of his predecessor."

6. The plaintiffs insist that they must be treated on a parity with land owners within the Rio Grande Project because no geographic boundaries to that project were ever defined by any formal order, and the notices of intent to appropriate (see footnote 1, supra) are broad enough to include the Hudspeth lands lying in the El Paso Valley. We think, however, that the notices are not susceptible of the construction that the project includes *all* the lands in the El Paso Valley, that the notices are expressly filed in connection with the Rio Grande Project, that before the rights claimed by the plaintiffs could have been acquired that Project had been sufficiently identified by con-

tracts of June 15, 1918 with Elephant Butte Irrigation District and of January 17, 1920 with El Paso County Water Improvement District No. 1, and, finally, that the Hudspeth District in its contract of December 1, 1924 recognized that the Hudspeth lands were "located in Texas *just below* the Rio Grande Federal Irrigation Project." The Act of February 25, 1905, footnote 2, supra, clearly left the boundaries of the Project to be ascertained, and just as clearly the Secretary of Interior had a reasonable discretion to ascertain what lands lay within the Project. See 43 U.S.C.A. § 373.

In the case at bar, the predecessors in office to the Reclamation officials had in the 1924 contract treated the plaintiffs' rights as secondary and inferior to the rights of the land owners of the Rio Grande Project and that was repeated by the present officeholders in the 1951 contract. The rationale of Goltra v. Weeks, supra, was expressly disapproved in Larson v. Domestic & Foreign Corp., supra, and the Court laid down a contrary doctrine:

> "We hold that if the actions of an officer do not conflict with the terms of his valid statutory authority, then they are the actions of the sovereign, whether or not they are tortious under general law, if they would be regarded as the actions of a private principal under the normal rules of agency. A Government officer is not thereby necessarily immunized from liability, if his action is such that a liability would be imposed by the general law of torts. But the action itself cannot be enjoined or directed, since it is also the action of the sovereign." 337 U.S. at page 695, 69 S.Ct. at page 1464.

Applying that test, it seems clear to us that if the dams, reservoirs and irrigation facilities had been owned by a private corporation whose managers and agents had violated the rights of the plaintiffs in the manner contended in this suit, the private corporation could not escape liability for damages on the ground that its employees were acting outside the scope of their authority.

Since Larson v. Domestic & Foreign Corp., supra, a very strict test must be applied when the suit is one not for damage but for specific relief, such as injunction either directing or restraining the defendant officers' actions, see 337 U.S. 688, 69 S.Ct. 1457. These dams, reservoirs and all other project facilities are owned by the United States, which operates them through the Bureau of Reclamation. See 43 U.S.C.A. § 498. Their operation depends upon the flow of water. Whatever may be the merits of the plaintiffs' contentions, the court would have no jurisdiction by declaratory judgment, see Lynn v. United States, 5 Cir., 110 F.2d 586, 588, or by injunction against Government officers to substitute itself in any part of the management and operation of the dams, reservoirs and facilities for the agency designated by Congress. In a case involving this same project, the Tenth Circuit arrived at the conclusion that the action was in essence a suit against the United States to which it had not consented and that it, therefore, must fail. State of New Mexico v. Backer, 10 Cir., 199 F.2d 426. We entertain the same opinion here. It results that the summary judgment on the merits for the defendants must be reversed and the cause remanded with directions to dismiss the complaint for want of jurisdiction.

Reversed and remanded with directions.