**FRIENDS OF THE EARTH et al.,**
**Plaintiffs,**

v.

**Ellis L. ARMSTRONG, Commissioner, Bureau of Reclamation, and Rogers C. B. Morton, Secretary of the Interior, Defendants.**

**Civ. No. 116–71.**

United States District Court,
D. Utah, C. D.
April 21, 1973.

James W. Moorman, and Victor H. Kramer, Washington, D. C., James B. Lee, Owen Olpin, Chris Wangsgard, and Constance Lundberg, Salt Lake City, Utah, for plaintiffs.

Thomas L. McKevitt, Washington, D. C., C. Nelson Day, Edward W. Clyde, Salt Lake City, Utah, Duke Dunbar, Denver, Colo., Kenneth Balcomb, Glenwood Springs, Colo., Robert L. McCarty, Washington, D. C., Andrew R. Hurley, Salt Lake City, Utah, Frank E. Maynes, Durango, Colo., George K. Fadel, Bountiful, Utah, John J. Conway, Denver, Colo., John A. Hughes, Montrose, Colo., Dallin W. Jensen, Salt Lake City, Utah, Clyde Martz, John D. McDowell, Denver, Colo., for defendants.

## OPINION

RITTER, Chief Judge.

Three plaintiffs join in this suit: Friends of the Earth, Wasatch Mountain Club, Inc., and Kenneth G. Sleight.

Friends of the Earth is a national membership conservation group which states in its pleadings that a number of its members periodically visit and enjoy the use of the Rainbow Bridge and the Monument site, and that they use them in a way that will be significantly injuriously affected by the actions of the defendants. The organization Friends of the Earth represents those injured members in this proceeding.

Wasatch Mountain Club, Inc., a local membership corporation of some 700 members, headquartered in Salt Lake County, Utah, whose purposes include recreation, preservation of the environment, and educational programs regarding the out-of-doors, alleges that, "Several of Wasatch Mountain Club's members periodically visit and enjoy the use of Rainbow Bridge National Monument and Wasatch Mountain Club organizes frequent trips to Rainbow Bridge and the surrounding area each summer." Wasatch Mountain Club further states that its members use the Rainbow Bridge and the Monument site in a way that will be significantly injuriously affected by the actions of the defendants. The organization Wasatch Mountain Club, Inc., represents its injured members in this proceeding.

Kenneth G. Sleight, the third plaintiff, is a resident of southeastern Utah, and lives in the general area of Glen Canyon and the Rainbow Bridge Monument. He is licensed and employed as a wilderness guide in the area of Rainbow Bridge National Monument. He conducts tours along the Green and Colorado Rivers in Utah and Arizona. Plaintiff Sleight has a special use permit to conduct guided tours in the Glen Canyon National Recreational Area, and in his capacity as tour guide, he has conducted several tours to Rainbow Bridge.

Plaintiffs, in this action in the nature of mandamus under 28 U.S.C. § 1361,[1] seek to prevent the Commissioner of the Bureau of Reclamation and the Secretary of the Interior from unlawfully allowing the waters of the reservoir impounded behind Glen Canyon Dam on the Colorado River to flow into Rainbow Bridge National Monument, and to require them to perform their statutory duties and take adequate protective measures to preclude impairment of the Rainbow Bridge National Monument.

Sections 1 and 3 of the Colorado River Storage Act[2] (which authorized construction of Glen Canyon Dam) provide as follows:

*Section 1—*

". . . That as part of the Glen Canyon Unit, the Secretary of the Interior shall take adequate protective

---

1. 28 U.S.C. § 1361 provides:

The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

2. 43 U.S.C. § 620 et seq.

measures to preclude impairment of the Rainbow Bridge National Monument."

*Section 3—*

"It is the intention of Congress that no dam or reservoir constructed under the authorization of this Act shall be within any national park or monument."

The emphasis Congress placed upon its intention to protect Rainbow Bridge National Monument is clear: Section 3, " * * * no dam or reservoir * * * shall be within *any* national park or monument." Section 1, " * * * the Secretary of the Interior shall take adequate protective measures to preclude impairment of Rainbow Bridge National Monument"—protection in general for Rainbow along with " * * * any national park or monument"—protection in particular for Rainbow in addition by an express statutory duty upon the Secretary of the Interior, in the Colorado River Storage Act " * * * as part of the Glen Canyon Unit * * *."

Congress intended Section 3 to be an absolute mandate whether protective works are ever constructed or not. Congress has not appropriated funds for the purpose of constructing the protective works contemplated in Section 1. See *infra.*

Both plaintiffs and defendants have moved for summary judgments.

Rainbow Bridge is a majestic sandstone arch in the eroded Colorado River Canyon lands of Utah. It is the world's largest natural arch.

To protect the great arch, the surrounding 160 acres were set aside as Rainbow Bridge National Monument by Presidential proclamation on May 30, 1910, a copy of which is attached to the complaint. The Monument, along with all our other national parks and monuments is under the charge of the National Park Service. Defendant Secretary of the Interior Morton is in charge of both the National Park Service and the Bureau of Reclamation, which, under him, manages the Glen Canyon Unit of the Colorado River Storage Project, which is a serious conflict of interest. Rainbow Bridge National Monument and other National Monuments are created by Executive Order pursuant to the Antiquities Act of 1906, § 2, 16 U.S.C. § 431, 34 Stat. 225 (1906) from lands of the public domain. They have the same status in law as the National Parks, which only differ from National Monuments in that they are created by special Congressional enactments and tend to be of greater area. The arch proved to be far and away the most spectacular in all nature and President Taft designated it a national treasure in the proclamation, the preamble of which recites:

"WHEREAS, an extraordinary natural bridge having an arch which is in form and appearance much like a rainbow, and which is three hundred and nine feet high and two hundred and seventy-eight feet span, is of great scientific interest as an example of eccentric stream erosion, and it appears that the public interest would be promoted by reserving this bridge as a National Monument, together with as much land as may be needed for its protection;".

Studies of the Navajo country were made during the field seasons 1909–1911 and 1913 by Herbert E. Gregory, geologist in the United States Geological Survey, and Yale University Professor of Geology, from 1900 to 1952.

Two principal publications came from Gregory's Navajo work during those field seasons: a large United States Geological Survey Water Supply Paper 380, (1916), and a United States Geological Survey Professional Paper 93, (1917). Both are publications of the Department of Interior, Franklin K. Lane, Secretary, United States Geological Survey, Government Printing Office, Washington, D. C.

Gregory's Water Supply Paper 380 (1916), the first of his several [3] important scientific contributions about the canyon country, is the first detailed description of the entire Navajo country. Prior to 1909, and at the start of Gregory's experience in the plateaus, geologic work had been restricted to the borders of the area Gregory studied. And Gregory could say: "In 1910 our party (U. S. Geological Survey) had the pleasure of making the first geological study of Navajo Mountain, a project not heartily approved by the Indians. To the Navajo the Mountain has sacred associations." (Water Supply Paper 380, page 47.)

The steps in the formation of the Rainbow Bridge are traced through the trained eyes of the eminent geologist in his Professional Paper 93, (1917), page 135:

"Perhaps the most striking erosion feature within the Navajo country is the recently discovered Rainbow Bridge, which spans Bridge Canyon, on the northwest slope of Navajo Mountain. (See Pl. XXXI, B.) Its symmetry and graceful proportions, as well as its size and beauty of color, give to this arch a commanding position among the natural bridges of the world. For the Navajos the bridge is Nonnezoshe, the great stone arch; to the Piutes its form and bright-red tones suggest Barohoini, the rainbow, the mythical path of the sun. In the landscape of Rainbow Plateau the bridge is not a conspicuous feature, being lost in a labyrinth of profound canyons and lofty towers. From the rim of Bridge Canyon it appears as a hoop bent across an inner gorge. (See Pl. XXXI, A.) In near view its grandeur is realized and its structural plan revealed. The arch rests on a bench of bedded sandstone below which the inner gorge of Bridge Creek is sunk to a depth of 80 feet. Between the chord uniting the springers at the level of this supporting bench and the lower side of the keystone point the vertical distance is

187 feet, and the arch at its summit is 42 feet thick. The total height of the crown above water is therefore 309 feet —exceeding that of the second greatest bridge in the United States, Sipapu (the gate of heaven), in White Canyon, Utah, by 89 feet. The span of the bridge is 278 feet.

"The bridge can not be traversed; its curvature is too great and its smoothed rock sides offer no footholds. Access to the summit is obtained by the use of ropes let down from the cliffs above.

"The Rainbow Bridge (see Pl. XXXII, B.) is carved from a single massive cross-bedded stratum of Navajo sandstone; the ends of the arch rest on bedded rock of middle La Plata age. One limb of the arch rises free from a broad platform and is encircled by an abandoned meander curve; the other limb is firmly buttressed against the canyon wall. In the light of these facts, the steps in the formation of the bridge may be traced. In its first expression the block from which the arch is carved extended from the canyon wall as a narrow meander cusp. The attack of the erosive forces was twofold: disks and shells outlined by curved laminae of the porous Navajo sandstone were removed from both faces of the spur and at the same time ground water was making its way through joint cracks and along the surface of the underlying relatively impervious beds. The spur was thus continuously narrowed and undermined. Whether the scaling reached a stage when the spur wall was perforated is not known; but it is believed probable that the wall was pierced by a window that stood above the newly developed subterranean channel. As time went on Bridge Creek adopted the shorter, steeper course beneath the spur, abandoning the ancient meanders. Undermining and scaling could then proceed at an increasing rate; the bridge was narrowed and increased in height and in length of span until the present magnificent arch

---

3. A bibliography of Herbert E. Gregory's publications on the geology of the Navajo Canyon country would include 28 papers published between 1910 and 1951.

was formed. The bridge thus owes its position to stream adjustment; its form is due to erosion of homogeneous sandstone guided by tangential cross-bedding."

Gregory says, (Water Supply Paper 380, P. 45, footnote 1): "The existence of this bridge was reported to me in July, 1909, by John Wetherill, who received his information from a Piute herdsman. A visit to this locality during this year was prevented by other obligations. In August, 1909, Mr. W. B. Douglass, of the General Land Office, in company with Prof. Byron Cummings of the University of Utah, were conducted to the bridge by Wetherill and Colville, of Oljeto. So far as known the Rainbow had not been viewed by white men before that date. This bridge has been described by my assistant, Joseph E. Pogue (The Great Rainbow Natural Bridge: Nat. Geog. Mag., Vol. 22, pp. 1048–1056, 1911)."

Joseph E. Pogue was scientific aid in the United States Geological Survey party assisting Herbert E. Gregory in his studies of the Navajo country, 1909–11 and 1913. (Water Supply Paper 380, 1916, and U.S.G.S. Professional Paper 93, 1917). Pogue visited the Rainbow Bridge with Gregory in July, 1910, during the field investigations that season. Gregory and his survey party visited the Rainbow Bridge less than a year (July, 1910) after the Cummings-Douglass party (August, 1909). Pogue's excellent description of Rainbow Bridge is based upon the field work of the Gregory survey party, and adopted by Gregory.

## "THE GREAT RAINBOW NATURAL BRIDGE OF SOUTHERN UTAH

By Joseph E. Pogue, United States National Museum.

Published by permission of the Director of the United States Geological Survey.

"Near the southeast corner of Utah, in a remote and wellnigh inaccessible part of the Navaho reservation now given over to the use of the Piutes, is situated a natural bridge, called by the Navahoes *Nonnezoshe,* the stone arch, by the Piutes *Barohoini,* the rainbow, which surpasses any structure of its kind known to man. Even the other great bridges of southern Utah, the Caroline, the Augusta, and the Edwin, known since 1902, are exceeded in size and beauty by the rainbow arch. Discovered but little over a year ago, it has thus far been visited by less than 25 white men and described but once. (Byron Cummings. The Great Natural Bridges of Utah. National Geographic Magazine v. 21 (1910), pages 157–167.)

"Recently a United States Geological Survey party, consisting of H. E. Gregory, in charge; John Wetherill, K. C. Heald, and the writer, stood upon the summit of Navaho Mountain and looked over a country of wildness and grandeur. Fifty miles to the north the graceful peaks of the Henry Mountains outlined themselves against the horizon; much nearer, the Colorado and San Juan rivers united in the midst of a tilted and disjointed table-land; to the west, the Colorado was already beginning to make that wonderful mile-deep gash so fitly called the Grand Canyon; while to the south was visible the even skyline formed by the extensive tops of Black and White mesas. Turn in whatever direction one would, the scene was one of bewildering magnitude.

"Nearer at hand, surrounding the mountain like an island, surged a billowy sea of red sandstone, carved into fantastic, rounded, and oval masses, colossal in size, between whose crossbedded and swirling slopes wound deep and tortuous canyons. Hidden away in such a labyrinth, it is not surprising that the bridge remained so long unknown. Yet it is only four miles distant in a northerly direction from the mountain's summit, and is visible from this point as a tiny arch, provided one knows exactly where to look. Otherwise the eye may wander at will over this wilderness of rock without sighting its most interesting feature.

"Although so close at hand, this goal was only reached after two days' time and a journey of 35 miles over a very indirect route. The mountain had to be descended to the south, a long detour made around its eastern flank, and a devious and winding course followed northward down the bridge canyon, over a trail ever difficult and ofttimes dangerous. The way led between lofty and perpendicular cliffs, towering to a sheer height of one-fifth of a mile, on whose vertical sides could now and then be described the crumbling ruins of some ancient cliff-dwelling.

"In places the walls overhung to form vast semi-spherical chambers, large enough to shelter a cathedral, and in which a shout echoed and re-echoed many times; in other places the sides approached so closely that the only foothold was in the rocky bed of the small stream below, where one was forced to pick a precarious passage from boulder to boulder.

"After hours of laborious and intricate travel, a point was rounded and 500 yards ahead a graceful arch was outlined, beneath which the canyon and stream continued their flexuous partnership. The first view of the bridge is minimized by the lofty walls beyond and the comparatively narrow defile, through which it is only partly visible; but once passed under, it may be seen in its magnificence and entirety.

"A towering arch, rainbow-shaped, of wonderful symmetry, rises nearly sheer from a ledge on the one side, and, spanning the stream, joins the opposite canyon wall on its downward curve. The opening, augmented by a gorge cut by the stream to a depth of 80 feet below the level of the supporting bench, measures a vertical distance of 267 feet; but the total height from stream-bottom to the top of the arch is 309 feet, while the abutments at their base stand 278 feet apart. The causeway, upon which one may be lowered from an adjacent cliff, but whose sides are too steep to serve for a complete passage, is 33 feet wide by 42 feet thick at its keystone point; and the limbs are not greatly in excess of these dimensions.

"A mere recitation of figures must fail to convey an adequate idea of the imposing nature of the bridge. It is not the size alone, though this far exceeds the greatest masonry arches constructed by engineering skill; nor is it solely the graceful lines or curvature of maximum stability, but rather all of these, that combine to make this the most remarkable single arch known. It would easily span, with room to spare, the dome of the Capitol at Washington; or, if hung over the Flatiron Building of New York, its limbs would come within a few feet of the ground, though to the west of Fifth Avenue on the one hand and to the east of Broadway on the other.

"The arch is carved from a buff-colored, fine-grained sandstone, brick-red upon its surface and stained with vertical streaks of a darker shade. Mostly massive, though in part oblique-bedded, the rock is only moderately firm, and is easily crushed beneath the blows of a hammer. Geologically it is a part of the Upper La Plata sandstone, a formation of great thickness, deposited in Jurassic time over a large portion of southeast Utah, southwest Colorado, and northeast Arizona.

"The origin of the arch is simple and evident. It was caused by the progressive narrowing of the neck of a meander intrenched between high and steep walls, until an opening was made through the tongue of intervening rock, permitting the stream to cut off its meander by flowing beneath the arch thus formed. The hole, once made, has been enlarged and given its present shape by the combined action of weathering, expansion, and contraction due to changes in temperature, and the carving effect of windblown sand, all of which unite to produce the rounded rock-forms so characteristic of this region. The abandoned arm of the meander is present and unmistakable, indicating the former course pursued by the stream.

"Though doubtless requiring many years for its formation, the arch is nevertheless a very recent *geological feature*, and destined to withstand the forces that gave it being for only a brief period as geologic time is reckoned.

"The bridge was first visited by white men and its existence made definitely known on August 14, 1909. It was then reached by a party consisting of W. B. Douglass, of the United States General Land Office, with four assistants; Bryon Cummings, of the University of Utah, with three students; John Wetherill, of Oljato, Utah; and two Piute Indians, Jim and Nasjabegay. Douglass was acting under instructions from the Department of the Interior, dated October 20, 1908, to investigate a reported natural bridge in southeast Utah, with a view to making it a national monument if found of sufficient interest. An attempt was made in December, 1908, to locate the bridge, but was abandoned on account of snow. The search was renewed in August, 1909, the party being joined at Oljato by Cummings, Wetherill, and the three students. The arch was surveyed by Douglass, and the figures herein used, as well as the details of its discovery, are taken from his official report to the Land Office.

"The bridge was undoubtedly known to the Indians prior to its discovery by white men: but as to the actual knowledge of it there is uncertainty. Douglass relates that Whitehorsebegay, his guide, *on a second visit to the bridge,* would not go beneath the arch, but laboriously clambered around one side whenever it was necessary to pass. Later Mrs. John Wetherill, an accomplished Navaho linguist, ascertained from an old Navaho that the arch is supposed to represent the rainbow, or sun-path, and one who passed under could not return without a certain prayer. Evidently Whitehoresebegay had forgotten this prayer and feared vengeance should he break the legendary prohibition. Nearly beneath the arch are the remains of an ancient altar, built doubtless by the cliff-dwellers, indicating that the bridge was probably an object of *superstitious worship even to this ancient people.*

"The bridge is at once the largest and most remarkable known. Not only in size but in shapeliness does it surpass any of its rivals. Below is tabulated for comparison the dimensions in feet of the largest of the natural bridges, the measurements of the first four taken from the surveys of W. B. Douglass.

|  | Height. | Span. | Width. | Thickness. |
|---|---|---|---|---|
| The Barohoini (rainbow) or Nonnezoshe (stone arch), southeast Utah | 309 | 278 | 33 | 42 |
| The Sipapu (gate of heaven) or Augusta, southeast Utah | 220 | 268 | 31 | 53 |
| The Kachina (guardian spirit) or Caroline, southeast Utah | 210 | 277 | 44 | 50 |
| The Owachomo (rock mound) or Edwin or Little, southeast Utah | 106 | 180 | 28 | 9 |
| The Virginia Natural Bridge | 200 | 45 |  |  |
| Pont d'Arc, France | 197 | 213 |  |  |

"The exact location of the bridge is latitude 37° 03′ 21″ and longitude 110° 56′ 48″ west of Greenwich (Douglass), in San Juan County, Utah; six miles northward from the Arizona-Utah boundary line; four miles west of north

from the summit of Navaho Mountain, and four miles above exit of the bridge canyon into the Colorado River at a point 16 miles below its confluence with the San Juan.

"The most exact directions for reaching the bridge would be inadequate, so obscure and devious is the trail leading thereto; hence the services of a guide are indispensable. Oljato, Utah, where guide and outfit for the final portion of the trip may be secured, is reached by two routes, between which there is little choice. On the one hand, Gallup, New Mexico, on the Santa Fe line, may be made the starting point, whence one must go by stage 35 miles to Fort Defiance, Arizona, and from there by wagon or pack outfit 155 miles in a northerly direction to Oljato. On the other hand, the traveler may leave a branch of the Denver & Rio Grande Railroad at Dolores, Colorado, stage 81 miles to Bluff, Utah, and there secure horses for the remaining 60 miles to Oljato. The bridge is distant from Oljato only 37 miles, as the crow flies, but the trail passes over twice this distance, and three days will be required for this last and most difficult part of the trip. A minimum of 18 days should be allowed for the round trip, whether the start be made from Gallup or Dolores, and the journey may be accomplished at any time during the year save in winter. The trip is an extremely arduous and toilsome one, and would be fraught with danger to an inexperienced traveler, but under competent guidance may be accomplished with no special hazard, though hardships and inconveniences, and many of them, must be expected.

"The government has already made of this natural wonder a national monument, thus preserving it for all time against vandalism and commercialism and conserving it for the enjoyment of all."

### The Forces of Erosion.

The keynote was struck when the President of the United States pro-claimed that Rainbow Bridge is of "great scientific interest as an example of eccentric stream erosion."

The natural forces which formed the Navajo country, Navajo Mountain, and Rainbow Bridge were incredibly powerful. Their potency was truly enormous. Those forces still are present and active and will be exerted upon the scene after Lake Powell waters fill Bridge canyon, as the defendants propose to do.

What effects will man's tinkering with nature have upon the Bridge?

The "piling of waters into canyons" is not new. Mother nature has been doing that a long, long time. There is evidence about that of unimpeachable authority. It comes from the land itself. Let us "spy out the land", and examine those most credible of all witnesses: the "stubborn and irreducible" facts.

Rainbow Bridge is a part of Navajo Mountain. It lies about halfway down the mountain, as the crow flies, west of north from the summit. The distance from the summit to the bed of the Colorado River before the dam, is about 8 miles. So Rainbow is about 4 miles from the summit of Navajo Mountain and 4 miles from the point where Bridge and Aztec Creeks joined the Colorado River. Before the dam, Navajo Mountain was on the very edge of the Glen Canyon of the Colorado River; now it is on the edge of Glen Canyon reservoir; and the Bridge is about to be in it.

"The extremes of relief are Navajo Mountain, 10,416 feet, and the mouth of the Little Colorado River, 2,800 feet above sea level. Along the line of Bridge Canyon an extreme range in elevation of 7,000 feet is attained in a distance of 8 miles." (U.S.G.S. Water Supply Paper, 380, 1916, Gregory, pp. 21–22). These are the greatest downward departures in the entire canyon country —Navajo Mountain, 10,416 feet, and the mouth of Bridge Creek, 3,400 feet above sea level.

"With gradients so steep conditions are favorable for erosion, and all the streams observed are not only carrying

the waste supplied by their tributaries, but are cutting their beds and removing materials * * * ". (Gregory, Professional Paper 93, 1917, p. 118).

The erosion on the northern and western sides of Navajo Mountain, (Rainbow side), is particularly heavy. The region possesses a "ruggedness probably surpassed by few other parts of the world. The relief is produced by downward departures from a general surface rather than by hills and mountains rising above plains and valleys. Canyons are so deep and so thickly interlaced that the region appears to be made up of gorges and cliffs intimately associated with mesas and buttes and towers bounded by vertical walls. It is a region of cliffs and canyons. *The streams appear to be impatient*; not content with removing the products of weathering, *they dig deep, closely spaced trenches directly into the rock and remove the intervening material by a process of lateral mining.* Plateau blocks are first outlined by a series of master trenches; secondary trenches cut each block into mesas; ramifying ditches of the third and fourth order cut along planes of fracture, reducing the size of the unit of work and increasing the area exposed to attack. The quarrying streams, substantially aided by disintegration, have long been in operation. In a few places their work is complete, the surrounding land having been reduced to the level of the bottom of the trench; elsewhere various stages of the process may be observed. Probably at no time has the work been more vigorously prosecuted than at present. *Graded streams are lacking in the Navajo country, waterfalls and rapids abound,* and it is difficult to conceive of an intricacy of canyon labyrinth and a variety of erosion remnants surpassing those exhibited by the Rainbow Plateau." (Gregory, Professional Paper 93, pp. 117–118, 1917).

Viewed from a distance Navajo Mountain appears as an island in the midst of a sea of waterworn and windworn, brilliantly colored sandstone. "Nearer at hand the profile consists of a steeply rising curve terminated upward by a bench above which lies a forest-covered dome * * *. *Frost work predominates at these altitudes, and areas acres in extent are thickly strewn with large angular blocks extending downward as rock streams.* Streams in steep-walled canyons reaching up from the Rainbow Plateau are actively eroding the mountain slopes. *On the north and northwest sides headward gnawing is particularly vigorous.* So deep and so close-spaced are the canyons leading to the Colorado and the San Juan that the interstream ridges stand out like buttresses supporting the mountain from the north." (Gregory, Professional Paper 93, 1917, p. 128).

"*Frost is an extremely active agent in the plateau* country. Its quarrying action is noticeable not only at the beginning and end of the cold season but at other times, owing to the wide variation between day and night temperatures. *On Navajo * * * Mountain the slopes above 8,500 feet are heavily coated with blocks of rock resulting from the mechanical work of ice.*" Gregory, Professional Paper 93, p. 118).

"Temperatures below the freezing point are recorded for 7 months of the year in Glen Canyon, 9 months in San Juan Valley, and 10 months on the plateau at Blanding. During most of these months periods of freezing and thawing alternate." (Gregory, Professional Paper 188, 1938, p. 95).

"Gentle rains lasting more than 24 hours are of very rare occurrence in the Navajo country. Only one such was experienced during my four seasons of work. *The characteristic storm is the thundershower of extreme violence,* lasting usually less than an hour * * * Many of the showers result in a heavy downpour, and the total precipitation for a month is not infrequently the result of a single shower." (Gregory, Water Supply Paper 380, 1916, p. 63, Professional Paper 93, 1917, p. 13).

"A study of 52 streams of the Navajo country shows that they fall into two

classes, perennial and intermittent. The intermittent streams are perennial through parts of their courses or flow only in response to showers or seasons of rain. These distinctions, which are of *the utmost importance to the inhabitants and to travelers,* are shown on the map * * *." (Gregory, Professional Paper 93, 1917, p. 12).

"The summer rains *radically change* the aspect of the country. The dry valley floors are covered with rivers and tributary brooks. A single shower may convert any one of a score of intermittent rills into a through-flowing stream and *raise a group of dry washes to the dignity of rivers.* * * * During this period the forbidding dry, hot valleys leading to the Little Colorado are transformed into a series of silt-laden rivers, some of them exceeding 100 miles in length, and the Little Colorado itself becomes a river of *commanding proportions* * * *." (Gregory, Professional Paper 93, 1917, pp. 12–13).

"The keynote of the climate of the Navajo country is variability, marked by sudden changes in temperature and wide fluctuation in rainfall. An intensely hot summer day may be followed by a chilly night; sunlight is synonymous with heat, shade with cold. The high temperature of the forenoon may be lowered by a cold rain or by a hailstorm, only to become reestablished within an hour. *When storms come the country is flooded* * * *." (Gregory, Professional Paper 93, 1917, pp. 13–14).

"The ephemeral streams are nearly always at flood stage, and *their potency in removing the products of disintegration is truly enormous* * * *." (Gregory, Professional Paper 93, 1917, p. 129).

"Their efficiency in stripping the slopes of waste and preventing the formation of talus is augmented by the texture of the rock. Much of the material supplied to the base of the cliff is fine, the product of disintegration of poorly compacted sandstone. In the areas of the Navajo sandstones large blocks pried off from the tops of the cliffs are so lacking in firmness that they crumble to sand on striking the lower slopes * * *. Cliffs in these strata are steep not because the rocks are hard but because they are friable." (Gregory, Professional Paper 93, 1917, pp. 129–130).

" * * * *All the power of the swollen stream* is suddenly applied to the task of *pushing rock waste* from the slopes and benches *into the adjoining flooded canyons.*" (Gregory, Professional Paper, 93, 1917, p. 130).

" * * * The floods that follow showers in July and August perform *an incredible amount of erosion:* it is unsafe to stand near the bank of a stream while torrents of liquid mud carrying trees and blocks of alluvium are passing." (Gregory, Professional Paper 93, 1917, p. 131).

" * * * Measures of fluctuation in mean annual rainfall have, however, little significance in this region. *Erosion results from sudden violent showers followed by unobstructed runoff* * * *." (Gregory, Professional Paper 93, 1917, p. 131).

"The most significant feature of the rainfall as regards erosion is the violence of showers and the consequent flooding of the surface and *piling of water into canyons.* It is no infrequent experience to observe a rise of 5 to 10 feet in the water of a creek in response to a single shower * * *". (Gregory, Professional Paper 93, 1917, p. 118).

*"Most rains are * * * torrential downpours. * * * In narrow canyons, dry for a month or more, the water of a newly made swift-flowing stream may reach a height of 10 feet or more within an hour * * *."* (Gregory, Professional Paper 188, 1938, p. 94).

Flash floods are violent in the extreme. They are disasters dreaded by inhabitants and travelers alike. Dry washes become rivers of commanding proportions. The forces they exert are enormous and unpredictable.

All the power of the swollen stream is suddenly applied to the task of pushing boulders, cobbles, gravel, logs and driftwood down the flooded canyon.

That Bridge Creek "undoubtedly is capable of transporting such material downstream during heavy flash floods", is admitted by defendants' own expert, geologist Wallace R. Hansen, in his 1959 "Administrative Report", page 15. "Such capability", he says, "is indicated by the coarse-textured alluvial deposit at the mouth of Aztec Creek", page 15.

Hansen's reference is to Aztec Rapids, the fast water of the Colorado River caused by the huge boulder delta of Aztec Creek. Historical sites in Glen Canyon, Crampton, No. 46 (Glen Canyon Series Number 12) June 1960, Anthropological Papers, University of Utah, pp. 98–100. Archeological Salvage Project with U. S. National Park Service. Historical Site 29, Aztec Creek.

Hansen further says, (p. 15) such "cobbly and bouldery material * * * is available in higher level terrace remnants at various points along the canyon." The terraces "commonly are 10 to 15 feet thick and they contain abundant quartzitic cobbles and boulders some of which exceed 4 to 5 feet in diameter." Hansen further says driftwood including logs is derived from the timbered heights of Navajo Mountain. (p. 15). Gregory reports that mechanical work of ice—freezing and thawing, has produced acres of large angular blocks of rock extending from the heights of Navajo Mountain as rock streams. (Gregory, Professional Paper 93, 1917, pp. 118 and 128).

So Bridge Creek has the "undoubted" capability of transporting quartzite cobbles and boulders exceeding 4 to 5 feet in diameter, logs and driftwood, all available up the canyon or on upper slopes of Navajo Mountain.

Water backed up by Glen Canyon dam will attain a depth of about 46 feet directly beneath Rainbow Bridge when the water level stands at altitude 3,700 feet above sea level.

Defendants' geologist Hansen adds, however: "Somewhat greater depths, possibly as much as 60 feet, may occur temporarily when periods of extreme flood stage on the Colorado River coincide with highwater behind Glen Canyon dam." (p. 18).

Hansen further says: "According to calculations of the Bureau of Reclamation the water surface of the reservoir will stand at altitude 3,700 feet only 13 percent of the time during the initial 50 years of operation, but it will be under the bridge 77 percent of the time and within the monument 95 percent of the time unless a barrier dam is constructed downstream to restrain it."

The contact between the Navajo sandstone of the Rainbow Bridge and the Kayenta sandstone on which the ends of the arch rest is at an altitude of about 3,720 feet beneath the Bridge.

At 3,700 feet altitude the depth under the Bridge is 46 feet, only 20 feet below the contact.

Defendants' geologist Hansen makes an amazing statement, (page 19). "The Navajo-Kayenta contact, at an altitude of about 3,720 feet beneath the Bridge, *is sufficiently high to preclude its being wetted even by flood stage water levels in the reservoir.* Even if the water could rise to the contact—which it could not—there is no reason to believe that Rainbow Bridge would be endangered. In fact, intermittent seepage now occurs in the Navajo sandstone just above the contact in the left abutment." Geologist Hansen does not at all consider the effect upon the Bridge of the *combined* high water of the reservoir and flash floods pushing a load of sediment consisting of 4–5 foot boulders, cobbles, gravel, logs and driftwood.

Before Glen Canyon dam, such sediments were flushed through the canyon to the Colorado River.

With Bridge Canyon filled to 3,700 feet elevation, the reservoir waters are a barrier. Has anyone considered what will happen when flash floods come roaring down the steep gradient of Bridge

Creek, with a load of 4–5 foot quartzite boulders, cobbles, logs and driftwood, and plow into the backed up waters of the reservoir right under Rainbow Bridge with explosive force?

Defendants' geologists did not. Nothing has come to the court's attention that anyone has given it any thought.

May it not be found with reasonable scientific certainty that boulders, cobbles, logs and driftwood will be caught up in a maelstrom and thrown against the moderately firm Navajo sandstone of the arch which can easily be crushed beneath the blows of a hammer? One limb of the arch rises free from a broad platform and is encircled by an abandond meander curve.

May it not be found with reasonable scientific certainty that on such occasions the stream, by a process of lateral mining, will quarry and remove the material between the sides of the gorge and the base upon which the limbs of the Bridge rest?

May it not be found with reasonable scientific certainty that water will enter the contact between the sandstones?

Defendants' geologist Hansen writes (p. 14): "Reservoir water would bypass the barrier dam chiefly by descending joints from the Navajo sandstone to the Kayenta formation, or by entering the Kayenta directly at canyon-floor level, and passing laterally along bedding planes through the Kayenta to the upstream part of Bridge Canyon. *The abundance of existing seepage in the upper part of Kayenta leaves little doubt of its capacity to transmit water*."

May it not be found with reasonable scientific certainty that water deteriorates the cement between the sandstone particles and hastens rock erosion?

Defendants' geologist Hansen notes (p. 7): "In some places, where the cementing material is chiefly calcite, the rock (Kayenta) is somewhat friable * * *."

May it not be found that there is a reasonable probability that the consequences of flooding the Bridge will be disastrous?

As bad as this situation appears to be, defendants' geologist Hansen says Bridge Canyon will fill up with the sediments, the boulders, cobbles, etc. "Impoundment of water behind Glen Canyon dam will impose an artificial base level on Bridge Creek within the boundaries of the national monument *whether a barrier dam is constructed downstream or not*. The effect of such a base level will be to cause sediments which normally are flushed through the canyon to the Colorado River to accumulate within the monument."

"Unless diverted out of Bridge Canyon via the proposed diversion dam and tunnel to Aztec Creek, sediment consisting of boulders, cobbles, gravel, sand, silt and driftwood, therefore, would accumulate ultimately throughout the length of Bridge Creek in the monument up to the high-water level of the reservoir at an altitude of 3,700 feet and in fact to greater heights as the deposits would gradually aggrade headward. Aside from the detrimental effect such sediments would have on the natural appeal of the monument, they would in time reduce the effective height of Rainbow Bridge by approximately 50 feet."

And, finally, may it not be found with reasonable certainty that, if plaintiffs, both clubs and their members, and the individual, the wilderness guide, are found to have made the requisite use of the Rainbow Bridge Monument as an element of the concept of standing, most assuredly such use would be significantly affected by the proposed actions of the defendants Morton and Armstrong and of the intervenors?

Defendants, the Secretary of the Interior and the Commissioner of the Bureau of Reclamation, and intervenors, the States of Colorado and Utah and numerous state and regional water conservancy districts contend (1), that this suit cannot be maintained because plaintiffs lack standing to sue, (2), that this is an unconsented suit against the Unit-

ed States, (3), that certain indispensable parties have not been joined, (4), that, even if the suit is proper, plaintiffs cannot prevail because § 3 was never intended to apply to Rainbow Bridge Monument and Glen Canyon Dam, and (5), in the alternative, even if § 3 is applicable, that it has been repealed by implication and is not enforceable. Since defendants and intervenors join in all of the arguments interposed by one another, hereinafter for the purpose of convenience they will all be referred to as defendants.

## Standing

The United States Supreme Court in its recent decision in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), reviewed its cases on the standing question in environmental protection cases. It is believed that all three of the petitioners here have standing within the *Sierra Club* rule.

The Sierra Club purposefully set out to enlarge the public's right to sue the Federal government. They desired a test case on the standing issue and argued that its status as a membership organization with a special interest in the conservation and sound management of the national parks, game refuges and forests of the country gave them sufficient standing to sue on behalf of the general public.

The Club did not "allege that it or its members would be affected in any of their activities or pastimes by the Disney development. Nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents." 405 U.S. 727, 735, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636.

No other plaintiffs—no individual or party directly affected by the project— were included in the suit. The Court says, footnote 8, pages 735–736, 92 S.Ct. page 1366: "In an *amici curiae* brief filed in this Court by the Wilderness So-

ciety and others, it is asserted that the Sierra Club has conducted regular camping trips into the Mineral King area, and that various members of the Club have used and continue to use the area for recreational purposes. These allegations were not contained in the pleadings, nor were they brought to the attention of the Court of Appeals. Moreover, the Sierra Club in its reply brief specifically declines to rely on its individualized interest, as a basis for standing. See n. 15 *infra*. Our decision does not, of course, bar the Sierra Club from seeking in the District Court to amend its complaint by a motion under Rule 15, Federal Rules of Civil Procedure."

The Supreme Court chose to adhere to the traditional notion of standing, which does not allow a group or individual the right to sue solely to protect "the public interest", and stated "The party seeking [a] review must have himself suffered an injury."

Friends of the Earth do not use this suit to test the issue of standing. They do not, as Sierra did, specifically decline to rely on its individualized interest, as a basis for standing. 405 U.S. 727, 735–736, 92 S.Ct. 1361, 31 L.Ed.2d 636, Note.

Friends of the Earth do state in their pleadings that its members use Rainbow Bridge and the National Monument site, and that they use them in a way that will be significantly affected by the actions of the defendants. The averment is "A number of F.O.E.'s members periodically visit and enjoy the use of Rainbow Bridge and the monument site." Also, *infra*.

Other plaintiffs directly affected by the defendants' actions are included in the suit with Friends of the Earth:

Wasatch Mountain Club, Inc., a membership corporation of some 700 members headquartered in Salt Lake County, Utah, whose purposes include recreation, preservation of the environment, and educational programs regarding the out-of-doors, alleges that, "Several of W.M. C.'s members periodically visit and enjoy

the use of Rainbow Bridge National Monument and W.M.C. organizes frequent trips to Rainbow Bridge and the surrounding area each summer."

Also, Kenneth G. Sleight, the third plaintiff, conducts tours along the Green and Colorado Rivers in Utah and Arizona. Plaintiff Sleight has a special use permit to conduct guided tours in the Glen Canyon National Recreational Area, and in his capacity as tour guide, he has conducted several tours to Rainbow Bridge. He lives in the general area and there can be no question that Sleight has standing to sue in this case. He falls precisely within that category of actual users defined by the Court in *Sierra Club* as being proper persons to sue to enforce a statute protecting the existing state of the place used.[4]

It is not necessary for the court to express an opinion whether § 3 may protect any economic interest claimed here by plaintiff Sleight. Perhaps insofar as Sleight has and uses a valid license to conduct tours in the Monument—that is, has and uses a permit to exploit the protected natural state of the Monument— he has some economic interest in maintaining the status quo of the Monument that springs out of the same purpose as that of § 3 to keep the place free of man-made encroachments, and thus comes within the protection of § 3. However, that may be, no one can gainsay that a man who chooses to make his living leading tours into such a place as Rainbow Bridge. Monument has an interest in the aesthetic, conservational and recreational values of the place, and plaintiff Sleight's claim of standing may be sufficient if he urges those interests only.

There would also seem to be little question as to the standing of plaintiff Wasatch Mountain Club, which organizes trips on behalf of its members to Rainbow Bridge Monument each summer. In its opinion in the appeal of *Sierra Club,* the Ninth Circuit, in finding that the Club lacked standing to sue because it failed to allege actual use of Mineral King by its members, distinguished the standing that might be alleged by "local conservation organizations made up of local residents and users of the area."[5] The Supreme Court affirmed and maintained the same distinction.[6] Since the summer months are those most suitable for trips into the Rainbow Bridge area, it appears that an allegation that visits are made each summer is sufficient indication of use as to confer standing.

Plaintiff Friends of the Earth is a national conservation group, but alleges that a number of its members periodically visit and enjoy Rainbow Bridge Monument. It is clear that an organization whose members are injured may represent those members in a proceeding for judicial review.[7] Such members of Friends of the Earth as visit the Monument are members of the organization for the purpose of furthering such interests as lead them to visit the Monument, hence it is not inappropriate that the organization should represent them here.[8] It is not alleged how many of the members of Friends of the Earth visit Rainbow Bridge Monument, or with what frequency, but the allegation that a number visit "periodically", whether it is taken to mean that there are some members who have made more than one visit or that there have been single trips

4.  405 U.S. 727, 735–737, 92 S.Ct. 1361, 31 L.Ed.2d 636.

5.  Sierra Club v. Hickel, 433 F.2d 24, 33, aff'd sub nom Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636.

6.  405 U.S. 727, 735, note 8, 92 S.Ct. 1361, 31 L.Ed.2d 636, and accompanying text; 405 U.S. 727, 738–739, note 14, 92 S.Ct.

1361, 31 L.Ed.2d 636, and accompanying text.

7.  405 U.S. 727, 739, 92 S.Ct. 1361, 31 L. Ed.2d 636, *citing* NAACP v. Button, 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed.2d 405.

8.  See 405 U.S. 727, 738, note 14, 92 S.Ct. 1361, 31 L.Ed.2d 636.

by many individual members, indicates on the part of the membership of Friends of the Earth a continuing, substantial interest in the Monument. It would not appear to offend the Sierra Club Rule to accord standing to an organization which in encouraging and developing the conservational and environmental interests of its members may have sponsored in some degree each of a number of single visits by its members. Particularly would that seem to be an appropriate interpretation of the rule with regard to a monument as inaccessible as this one. The white population of the Navajo country, according to official estimates for 1912, numbered 521 and included government officials, traders, and missionaries living at widely separated places. Gregory, Professional Paper 93, 1917, pp. 9 and 14.

Friends of the Earth allege that they are a membership organization "dedicated to the preservation, restoration, and rational use of the environment in the United States and throughout the world. In furtherance of its purposes F.O.E. engages in a variety of educational programs and in legislative and other activities. F.O.E. is particularly interested in preserving the integrity of national parks and monuments such as Rainbow Bridge National Monument. A number of F.O.E.'s members periodically visit and enjoy the use of Rainbow Bridge and the monument site."

The complaint contains other allegations, and there is evidence in the record, that shows that the members of F.O.E. use Rainbow Natural Bridge and the monument site in ways that would be significantly affected if the Glen Canyon Reservoir is allowed to rise to a level which permits the waters to enter the boundaries of the National Monument and flow under the Bridge.

Glen Canyon Reservoir, known as Lake Powell, would reach an elevation of 3,700 feet above sea level if allowed to fill to its maximum capacity. At a lower level, 3,606 feet, it will invade Rainbow Bridge National Monument. At 3,645 feet, Lake Powell will reach Rainbow Bridge itself, and at 3,700 feet, the depth under Rainbow Bridge will be 48 feet. By using additional storage preserved for Flood Control purposes, the height of Lake Powell may eventually reach 3,711 feet, or a depth of 59 feet under Rainbow Bridge. The foregoing figures are taken from Administrative Report of Geologist Wallace R. Hansen, Bureau of Reclamation, a geologic examination of Rainbow Bridge National Monument, submitted to the Commissioner on January 15, 1971, attached as Exhibit "B" to Affidavit of David L. Crandall, filed in the United States District Court, District of Utah, on January 4, 1972.

Plaintiffs' Exhibit 2, Utah, in the case at bar, No. C 116–71, is an aerial view showing the waters of Lake Powell within the Monument and very close to Rainbow Bridge on July 19, 1971.

The plaintiffs allege that damage to Rainbow Bridge from fluctuating standing water beneath it will occur. The destruction of natural vegetation, the waterlines left on the canyon walls during reservoir drawdown, and the reduction in the height above water of Rainbow Bridge by the height of the water beneath will impair the monument. Constant wetting and drying and thawing and freezing the foundation sandstone supporting Rainbow Bridge may over time weaken the structure of the bridge to a point where it may crumble.

The plaintiffs further allege that defendants have violated, are now violating, and unless the relief requested is granted, will continue to violate, the Colorado River Storage Project Act in that they have failed to take adequate protective measures to preclude impairment of Rainbow Bridge National Monument in violation of Section 1 of said Act. Unless the relief requested is granted defendants will also be in violation of Section 3 of said Act in the very near future by allowing Glen Canyon Reservoir to be within Rainbow Bridge National Monument.

Impairment of Rainbow Bridge National Monument can be prevented immediately by limiting the maximum level of Lake Powell to a height of 3,600 feet above mean sea level.

■ There is no doubt at this time that one who alleges injury in fact, due to administrative action of a federal officer, to an interest which reflects aesthetic, conservational, recreational or economic values arguably within the zone of interests protected by a statute, has standing to sue for redress in this court.[9] The crucial question of injury in fact under this rule is not one of magnitude of injury. In that regard, all that need be asked is whether the act said to result in injury is one proscribed by the statute. The crux of injury in fact is whether plaintiff has an interest of such magnitude that injury to it is judicially cognizable.

The question remains whether plaintiffs' interests in the aesthetics, conservational and recreational values of Rainbow Bridge Monument are protected by Section 3 of the Storage Project Act. That question is readily answered. The national parks and monuments were set aside, free from the encroachments of civilization, specifically for aesthetic, recreational and conservational purposes. Section 3 was added to the Storage Project Act at the insistence of conservation groups in order to preserve the national policy with regard to the national parks and monuments. It is hardly subject to doubt that the purpose of a prohibition against man-made dams and reservoirs within national parks and monuments is to continue and protect the policy of preserving the aesthetic, recreational and conservational values

inherent in the natural state of these places.

It is appropriate at this point to detail the important part played by the conservationists in the legislative history of the provisions of the Storage Project Act in issue here. Early versions of the Storage Project Act called for the construction of Echo Park Dam and Reservoir in Dinosaur National Park, and Glen Canyon Dam and Lake Powell, part of which would intrude into Rainbow Bridge National Monument. A coalition of national conservationist groups formed in opposition to the bill as thus drafted, and took the position before Congress that the national policy of preventing man-made encroachments upon national parks and monuments required deletion from the Storage Project Act of the Echo Park proposal and limitation of the Glen Canyon proposal so as to keep Lake Powell out of Rainbow Bridge Monument. The conservationists gained sufficient support in Congress to stop passage of the Act entirely,[10] with the result that the proponents of the Act were forced to concede deletion of the Echo Park proposal and addition to the Act of Sections 1 and 3 quoted at the beginning of this opinion in exchange for withdrawal by the conservationists of their opposition to passage of the Act.[11]

The conservationists and the proponents of the Act viewed the accommodation they had reached as a mutual and binding agreement, and they portrayed it to the members of Congress as such. The agreement is set forth most clearly in the following letter from leaders of the conservationists to Representative Aspinall of Colorado. The letter ap-

9. Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184; Sierra Club v. Morton, *supra*.

10. See, *e. g.*, Hearings before the Subcommittee of the Committee on Appropriations, Senate, 87th Cong., 1st Sess., at 64 (John A. Cover); *Id.* at 617–621

(Howard Zahniser); *Id.* at 627–628 (Spencer M. Smith).

11. See Cong.Rec., Vol. 102, Pt. 3, 84th Cong., 2d Sess., at 3475 (Representative Aspinall); Cong.Rec., Vol. 102, Pt. 5, 84th Cong., 2d Sess. at 5737 (Senator Anderson).

pears in explanation of the amendments to the Act in a Supplemental Report of the Committee on Interior and Insular Affairs of the House of Representatives.

January 23, 1956

Hon. Wayne N. Aspinall
House of Representatives
Washington, D. C.

Dear Mr. Aspinall:

Congressmen from the upper Colorado Basin States and prospective Senate conferees have guaranteed the Nation's conservationists that the Echo Park Dam "will not be reinserted" into the upper Colorado bill when it comes up for action in this session of Congress, and the administration has also reversed its former stand on this matter and has agreed to drop the Echo Park proposal.

Furthermore, we have now been assured that the following two provisos will be added, in their appropriate places, to H.R. 3383 when it reaches the floor of the House and that Senator Anderson and other prospective Senate conferees will support that inclusion of these two provisos:

1. *Provided further*, That as part of the construction, operation and maintenance of the Glen Canyon unit the Secretary of the Interior shall take adequate protective measures to preclude impairment of the Rainbow Bridge National Monument.

2. It is the intention of Congress that no dam or reservoir constructed under the authorization of this act shall be within any national park or monument.

In view of these agreements we no longer oppose this bill. In fact, we also wish to commend the proponents of the project for the addition of these provisos, which we are glad to support as of great positive value to the cause of conservation, for they are a reaffirmation of the national park principle at a time when the national park system, in the minds of many, is in serious danger.

We who have led the fight against the Echo Park Dam are accordingly pleased to be able to take our present position.

Sincerely yours,
Horace M. Albright,
Trustee for Conservation
Ira N. Gabrielson,
Citizens' Committee on
Natural Resources
Howard Zahniser,
Council of Conservationists [12]

The House Committee Report said:

"The committee has received similar letters from the following: American Nature Association, the American Forestry Association, National Wildlife Federation, the Wilderness Society, National Parks Association, Izaak Walton League of America, Inc., Sierra Club, Wildlife Management Institute, General Federation of Women's Clubs, Conservation Education Association, and National Audubon Society." [13]

Later, the Conference Report of the two Houses stated:

"The matter of retaining intact our national park system was an important issue in the consideration by Congress of this legislation. The House approved bill—(1) deleting the Echo Park Storage unit, (2) requiring 'protective measures to preclude impairment of the Rainbow Bridge National Monument', and (3) expressing the 'intention of Congress that no dam or

12. Supplemental Report to accompany H. R. 3383, 84th Cong., 2d Sess., at 11. The Supplemental Report also indicates that the Committee on Interior and Insular Affairs had received similar letters from the American Nature Association, American Forestry Association, National Wildlife Federation, Wilderness Society, National Parks Association, Izaak Walton League of America, Inc., Sierra Club, Conservation Education Association, Wildlife Management Institute, General Federation of Women's Clubs, and National Audubon Society.

13. *Id.*

reservoir constructed under the authorization of this act shall be within any national park or monument,' . . . makes clear the intention of the House that there be no invasion or impairment of the national park system by the works authorized to be constructed under this legislation. The conference committee upheld the House position and adopted the House-approved language." [14]

Representative Aspinall said of the agreement:

The legislation now before this committee (Committee on Interior and Insular Affairs, House) does not contain the controversial Echo Park unit. The substitute legislation proposed by the committee goes much further in that it provides "that as part of the Glen Canyon unit, the Secretary of the Interior shall take adequate protective measures to preclude impairment of the Rainbow Bridge National Monument"; and, further, "it is the intention of Congress that no dam or reservoir constructed under the authorization of this act shall be within any national park or monument." And may I here and now advise this committee that the sponsors of the legislation promise and agree with the Members of the House that they shall keep their agreement with the conservationists of the Nation in this particular.[15]

No serious problem of breach of this agreement by reauthorization of the Echo Park project ever arose because Echo Park was replaced in the bill by the alternative Flaming Gorge Dam and Reservoir, construction of which was begun shortly after passage of the Act. The keeping of the agreement with regard to construction of protective works for Rainbow Bridge Monument, however, passed largely into the hands of the appropriations committee of the House and Senate. The records of proceedings before these committees is the record of strenuous efforts by original proponents of the Act to prevent construction of the protective works.

The fight for the protection of Rainbow Bridge Monument was thus prolonged. The battle took two courses. In the appropriations committees, representatives of the Basin States, including proponents of the original Storage Project Act, opposed any appropriation for the construction of protective works for Rainbow Bridge Monument. Year after year, the appropriations committees recommended against the appropriation, and Congress followed these recommendations.[16] The conservationists also appeared in the appropriations committees hearings. They steadfastly maintained that failure to construct the protective works breached a good faith agreement, but, nevertheless, left the Section 3 prohibition in force.[17] Apparently in view of these protestations of the conservationists, joined in by officials of the Department of the Interior and the Bureau of Reclamation,[18] the

---

14. House of Representatives Report No. 1950, 84th Cong., 2d Sess. at 8.

15. Cong.Rec., Vol. 102, Pt. 3, 84th Cong., 2d Sess., at 3510.

16. See P.L. 86–700 (1961), 74 Stat. 743; P.L. 87–300 (1962), 75 Stat. 649; P.L. 87–880 (1963), 76 Stat. 1216; P.L. 88–257 (1964), 77 Stat. 844; P.L. 88–511 (1965), 78 Stat. 682; P.L. 89–299 (1966), 79 Stat. 1096; P.L. 89–698 (1967), 80 Stat. 1066; P.L. 90–147 (1968), 81 Stat. 471; P.L. 90–479 (1969), 82 Stat. 705; P.L. 91–144 (1970), 83 Stat. 323; P.L. 91–439 (1971), 84 Stat. 890; P.L. 92–134 (1972), 85 Stat. 365.

17. See note 12, *supra*. See also Hearings before the Subcommittee of the Committee on Appropriations, House of Representatives, 87th Cong., 1st Sess., at 493 (Dominy) ; *Id.* at 495 (Dominy) ; Hearings before the Subcommittee of the Committee on Appropriations, House of Representatives, 87th Cong., 2d Sess., at 739–744 (Anthony Wayne Smith).

18. See Hearings before the Subcommittee of the Committee on Appropriations, House of Representatives, 86th Cong., 2d Sess., at 518 (Commissioner Dominy, Bureau of Reclamation); Hearings before the Subcommittee of the Committee on Appropriations, Senate, 86th

Senators from Utah also instituted numerous bills calling for the repeal or limitation of Section 3 so as to permit flooding of the Monument.[19] All of these bills failed of passage.

### Sovereign Immunity

■ Defendants invoke the doctrine of sovereign immunity and contend that this suit cannot be maintained because it is an unconsented suit against the United States.

There is no merit to this contention. This is not a suit against the sovereign; it is a suit against Ellis S. Armstrong and Rogers C. B. Morton, the individuals who have done the wrongful acts.

Section 3 of the Storage Project Act is a specific congressionally mandated limitation upon the authority of the defendants to fill Lake Powell to capacity. This limitation qualifies any provision in the Act that might be thought to give defendants authority to use Glen Canyon Dam to capacity, as defendants propose to do.

Section 3 is a singularly strong provision: "It is the intention of Congress", etc., as if to say, "and you'd better believe it!"

■ It seems never to have been supposed that sovereign immunity would bar a suit such as the present in which plaintiff seeks to enjoin breach by an officer of the sovereign of a specific limitation on his authority to act. Courts have been granting relief by way of mandamus in such cases ever since Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1802) (". . . where a specific duty is assigned by law,

and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy.").

Defendants rely upon Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), and Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962).

Their reliance is misplaced. The United States Supreme Court in Larson, id., 337 U.S. pages 701–702, 69 S.Ct. page 1467 said, " * * * we adhere to the rule * * * and to the principal which has been frequently repeated by this Court * * *: the action of an officer of the sovereign (be it holding, taking or otherwise legally affecting the plaintiff's property) can be regarded as so 'illegal' as to permit a suit for specific relief against the officer as an individual only if it is not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void."

The court in Malone v. Bowdoin, id., 369 U.S. p. 647, 82 S.Ct. p. 983, referring to Larson said:

"Cutting through the tangle of previous decisions, the Court expressly postulated the rule that the action of a federal officer affecting property claimed by a plaintiff can be made the basis of a suit for specific relief against the officer as an individual only if the officer's action is 'not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally

Cong., 2d Sess., at 622 (Dominy); Hearings before the Subcommittee of the Committee on Appropriations, House of Representatives, 87th Cong., 1st Sess., at 491 (Dominy); Id. at 493 (Dominy); Hearings before the Subcommittee of the Committee on Appropriations, House of Representatives, 87th Cong., 2d Sess.,

at 4 (Secretary of the Interior Udall); Hearings before the Subcommittee of the Committee on Appropriations, Senate, 87th Cong., 2d Sess., at 54 (Secretary Udall).

19. See S. 1188 (1960); S. 3180 (1960); S. 175 (1961); S. 333 (1963); S. 1555 (1967); S. 307 (1969).

void.' 337 U.S., at 702, 69 S.Ct. at 1467. Since the plaintiff had not made an affirmative allegation of any relevant statutory limitation upon the Administrator's powers, and had made no claim that the Administrator's action amounted to an unconstitutional taking, the Court ruled that the suit must fail as an effort to enjoin the United States.

"While not expressly overruling United States v. Lee, *supra* [106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171], the Court in *Larson* limited that decision in such a way as to make it inapplicable to the case before us. Pointing out that at the time of the *Lee* decision there was no remedy by which the plaintiff could have recovered compensation for the taking of his land, the Court interpreted *Lee* as simply 'a specific application of the constitutional exception to the doctrine of sovereign immunity.' 337 U.S. at 696, 69 S.Ct. at 1464. So construed, the *Lee* case has continuing validity only 'where there is a claim that the holding constitutes an unconstitutional taking of property without just compensation.' *Id.*, at 697, 69 S.Ct. at 1465.

"No such claim has been advanced in the present case. Nor has it been asserted that the petitioner was exceeding his delegated powers as an officer of the United States in occupying the land in question, or that he was in possession of the land in anything other than his official capacity. This suit, therefore, is not within the class of cases in which, under *Larson*, specific relief can be obtained against a government officer." Justice Douglas' dissent is interesting.

In the present case plaintiffs affirmatively allege an explicit statutory limitation upon the powers of defendants Armstrong and Morton. The *Larson* case makes the same distinction again, *id.* p. 691, 69 S.Ct. p. 1462:

"* * * There was no claim made that the Administrator and his agents, etc., were acting unconstitutionally or pursuant to an unconstitutional grant of power. Nor was there any allegation of a limitation on the Administrator's delegated power to refuse shipment in cases in which he believed the United States was not obliged to deliver. There was, it is true, an allegation that the administrator was acting 'illegally,' and that the refusal was 'unauthorized.' But these allegations were not based and did not purport to be based upon any lack of delegated power.[12]"

"12. This case must, therefore, be clearly distinguished from cases like Noble v. Union River Logging R. Co., 147 U.S. 165, 13 S.Ct. 271, 37 L.Ed. 123 (1893). In that case, it was held that the officer being sued lacked power to refuse delivery because, under the statutory scheme, his predecessor's determination that the plaintiff was entitled to delivery was binding. A similar case would be presented here if the statute expressly provided that the Administrator's interpretations of contracts should be binding and irrevocable and if a later, or subordinate, official refused to follow a prior binding interpretation. In such a case the issue would not be the correctness or incorrectness of the later decision under general law but simply the power of the official, under the statute, to make a decision at all. Cf. Ickes v. Fox, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937)."

The cases from Marshall's decision in Osborn v. Bank, 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824), in which the great central principle was: where the plaintiff complained that a state officer had inflicted a trespass contrary to the Constitution or Statutes of the United States, he could have relief, through United States v. Lee, 106 U.S. 196, 1 S. Ct. 240, 27 L.Ed. 171 (1882); Ickes v. Fox, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937); Goltra v. Weeks, 271 U.S. 536, 46 S.Ct. 613, 70 L.Ed. 1074 (1926); Philadelphia v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570 (1912); Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947) to Larson v. Domestic & Foreign Commerce Corp., and Malone v. Bowdoin are analyzed in 77 Harvard

Law Review p. 21 (1963–64), by Professor Jaffe. The article is illuminating and helpful.

### Indispensable Parties.

■ Two of the states of the Upper Basin of the Colorado River, Colorado and Utah, have intervened in this action. Three of the Upper Basin states, Wyoming, New Mexico, and Arizona, are not in the action. Defendants contend that Wyoming and New Mexico, as beneficiaries of the Upper Colorado River Basin Fund,[20] are indispensable parties to this suit, and, thus, that the suit must be dismissed since, as sovereigns, Wyoming and New Mexico will not consent to it.

Defendants' contention suggests some interesting questions regarding the interest of the Upper Basin states in the outcome of this suit, and an interesting conflict between the eminently equitable standard of Rule 19 of the Federal Rules of Civil Procedure (setting forth criteria for defining indispensable parties) and the doctrine of sovereign immunity, which brooks no equities. It is not necessary, however, to reach these problems in arriving at an answer to defendants' contention.

As pointed out earlier, a suit to enjoin acts of an officer is not to be regarded as a suit against the sovereign where the acts complained of are alleged to be in violation of a statute of the sovereign limiting the authority of the officer to act. There is no pretense here that Section 3 of the Storage Project Act, the federal statute in question, is not the law of any of the Upper Basin states: the federal statute binds the sovereignty of the states. Because this is a suit to enjoin acts of the Secretary and the Commissioner claimed to be in violation of a statute as much the law of the Upper Basin states as if their state legisla-

tures had passed it, this is no more a suit against the sovereignty of the Upper Basin states than it is a suit against the sovereignty of the United States, and none of the Upper Basin states is any more an indispensable party to this suit than the United States is.

### Section 3 is applicable to Glen Canyon Dam and Rainbow Bridge Monument.

■ Defendants have raised no serious question about the applicability of § 3 to Glen Canyon Dam and Rainbow Bridge Monument. The section is applicable by its terms, and defendants offer nothing which shows that the terms do not mean what they say. Additionally, there is a great deal of extrinsic evidence indicating that the section applies to the Dam and the Monument.

Defendants say that only § 1 was intended to apply to Rainbow Bridge Monument, and that § 3 was intended to apply—apparently *in futuro*—to a project called Echo Park Dam, which eventually was not authorized by the Storage Project Act, and to certain other dams and reservoirs which were authorized. The legislative history of the Storage Project Act seems entirely contrary to what defendants contend.

As noted earlier, sections 1 and 3 were added to the Storage Project Act upon agreement between proponents of the Act and conservation groups. The conservationists first insisted that authorization for Echo Park Dam and reservoir be removed from the Act because the dam and reservoir would have been within Dinosaur National Park. Echo Park was removed from the bill, but the conservationists continued to insist that § 3 be included. Defendants say this insistence on § 3 was to prevent future reauthorization of Echo Park and development of authorized dams and reservoirs in such a way that they might come within a national park or monu-

---

20. See Article V, Colorado River Compact.

ment. Defendants agree, however, that none of the authorized dams and reservoirs, save Glen Canyon Dam and Lake Powell, were originally proposed to be located in such proximity to a national park or monument as to be seriously threatening,[21] and Echo Park Dam and reservoir were replaced in the bill by Flaming Gorge Dam and reservoir, construction of which was begun shortly after passage of the Act. Thus, while it is plausible that § 3 was intended to apply peripherally for the purposes defendants allege, in addition to its applicability to Rainbow Bridge Monument, it is not plausible that the section was intended to apply exclusively as defendants allege and not to Rainbow Bridge Monument. There are numerous statements of conservationists and government officials in hearings relative to the Act which specifically recognize the applicability of § 3 to Glen Canyon Dam and reservoir and Rainbow Bridge Monument.[22] Between 1960 and 1969, Utah's Senators Bennett and Moss introduced into the Senate a total of 6 bills, the effect of which would have been to repeal or limit § 3 so as to permit the flooding of Rainbow Bridge Monument.[23] The lack of support in Congress for repeal of section 3 of the Storage Project Act is shown by the inability of the sponsors of these six bills to get them enacted.

Moreover, it affirmatively appears that § 1 was not proposed by the conservationists as the exclusive means of protecting Rainbow Bridge Monument. Section 1 apparently was first proposed by the Bureau of Reclamation, after the conservationists began to insist on the removal of Echo Park and the inclusion of § 3, and for the apparent purpose of authorizing a means of avoiding the effects of § 3 on Glen Canyon Dam and reservoir.[24] Perhaps the Bureau of Reclamation, before passage of the Act, en-

---

21. See also Cong.Rec., Vol. 102, Pt. 3, 84th Cong., 2d Sess., p. 3475 (testimony of Representative Aspinall):

The bill, consideration of which would be in order upon the approval of the resolution now before us, does not authorize, or even contemplate, the construction of any facility having an adverse effect on any area reserved as a national park or national monument. On the other hand, the legislation as approved by the committee specifically provides for the protection of the Rainbow Bridge National Monument should it be endangered by the construction of the Glen Canyon unit. It goes even further and provides that it is the intention of Congress that no dam or reservoir constructed under the authorization of this act shall be in any national park or monument.

22. See Hearings before the Subcommittee of the Committee on Appropriations, House of Representatives, 86th Cong., 2d Sess., at 518 (Commissioner Dominy, Bureau of Reclamation); Hearings before the Subcommittee of the Committee on Appropriations, Senate, 86th Cong., 2d Sess., at 622 (Dominy); Hearings before the Subcommittee of the Committee on Appropriations, House of Representatives, 87th Cong., 1st Sess., at 491 (Dom-iny); Id. at 493 (Dominy); Hearings before the Subcommittee of the Committee on Appropriations, Senate, 87th Cong., 1st Sess., at 614–615 (John A. Cover, Secretary and Member, Board of Trustees, National Parks Association); Id. at 619–620 (Howard Zahniser, Executive Secretary and Editor, The Wilderness Society, and original signatory of the conservationist agreement); Id. at 628 (Dr. Spencer M. Smith, Jr. Secretary, Citizens Committee on Natural Resources); Id. at 627 (J. W. Penfold, Conservation Director, Isaak Walton League); Hearings before the Subcommittee of the Committee on Appropriations, House of Representatives, 87th Cong., 2d Sess., at 4 (Secretary of the Interior Udall); Id. at 739 (Anthony Wayne Smith, Attorney); Id. at 751–752 Senator Magnusson); Hearings before the Subcommittee of the Committee on Appropriations, Senate, 87th Cong., 2d Sess., at 54 (Secretary Udall).

23. See Note 21, supra.

24. See Hearings before the Subcommittee of the Committee on Appropriations, 87th Cong., 1st Sess., at 617–621 (Howard Zahniser); Id. at 621–626 (extract, testimony of representatives of the Bureau of Reclamation at the time of the orig-

tertained the notion of limiting the height of Glen Canyon Dam, and perhaps as much as would keep the waters of Lake Powell out of the Monument. However that may be, it appears that after the Bureau finally decided to construct a dam of 3,700 feet, they proposed § 1 to the conservationists and proponents of the Act, and the conservationists thereafter sought inclusion of § 1 in the Act. This chronology, and the source of § 1 indicates as clearly as anything might that § 3 was intended and understood to apply to Glen Canyon Dam and reservoir. The fact that after § 1 was included in the Act both conservationists and government officials continued to observe that § 3 would apply to limit the height of Lake Powell indicates that § 1 was not understood as a quid pro quo for waiving the effect of § 3 with regard to Glen Canyon Dam and reservoir.[25]

The immediately preceding also disposes of defendants' contention that limiting the height of Lake Powell to the extent that might be necessary to protect Rainbow Bridge Monument is too untoward a result to have been contemplated in the passage of § 3. Plainly, that result was in fact contemplated.

### Implied Repeal.

Decision of this case turns upon the viability of defendants' suggestion that Section 3 of the Storage Project Act has been repealed by implication. It is the universal rule that implied repeals are disfavored, and will not be found unless the intent of the legislature to repeal is manifest.[26] That is, an implied repeal may be found only where a later act covers the whole subject matter of an earlier, and it is clearly the intent of the legislature to substitute the second for the first, or where a later act is so repugnant to an earlier that it is impossible to give effect to both.[27] Whenever possible, nominally inconsistent acts will be construed together and effect will be given to both.[28]

Defendants say that this Court can ignore the explicit statement of legislative intent in Section 3 of the Storage Project Act because the Court can infer from amendments and additions to the Act an intent of Congress that Lake Powell be filled to capacity notwithstanding encroachment upon national parks and monuments. The doctrine of implied repeals, however, authorizes no breaches in the ancient rule that the judgment of the court will not be substituted for that of the legislature. Where the intent of the legislature has been made explicit, judicial construction ends.[29] All that is authorized by the doctrine of implied repeals is that where the legislature has made a second, equally explicit, contrary statement of its in-

inal conservationist agreement) ; *Id.* at 627 (letter from Isaak Walton League of America to Carl Hayden, re: Bureau of Reclamation proposal of Section 1). See also Hearings before the Subcommittee of the Committee on Appropriations, House of Representatives, 87th Cong., 2d Sess., at 707 (Rep. Aspinall). House of Representatives Report 1087, Part 2, 84th Cong., 2d Sess., is not contra insofar as it indicates only that the *language* of the Section 1 proviso was the conservationists'.

25. See Note 24, *supra.*

26. *E. g.,* United States v. Borden Co., 308 U.S. 188, 198, 60 S.Ct. 182, 84 L. Ed. 181 (1939) ; Posadas v. National City Bank, 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1935). See also City of Tulsa, Okla. v. Midland Valley R. Co., 168 F.2d 252 (10th Cir. 1948) ; In re Bear River Drainage District, 267 F.2d 849 (10th Cir. 1959).

27. *E. g., Posadas, supra;* District of Columbia v. Hutton, 143 U.S. 18, 26–27, 12 S.Ct. 369, 36 L.Ed. 60 (1891).

28. *E. g.,* District of Columbia v. Hutton, *supra;* Rosenberg v. United States, 346 U.S. 273, 294, 73 S.Ct. 1152, 97 L.Ed. 1607 (1953). See also Bartlett v. United States, 166 F.2d 920 (10th Cir. 1948).

29. *E. g.,* Thompson v. United States, 246 U.S. 547, 551, 38 S.Ct. 349, 62 L.Ed. 876 (1918) ; Gorin v. United States, 111

tentions with regard to a subject, the court may apply the second act and treat the first as repealed.

The above, in the context of the present case, means that this Court must treat Congress' express statement of its intentions in Section 3 of the Storage Project Act as dominant over and controlling mere inconsistencies in later enactments. Thus, if defendants are to prevail here, it cannot be enough for them to show that Congress authorized construction of Glen Canyon Dam in such a way that its operation *might* flood Rainbow Bridge Monument. It would be necessary to show—at least—that Congress had affirmatively required the operation of the Dam in such a way that Rainbow Bridge Monument must be flooded. Thus, it cannot be enough to show that there have been constructed upon congressional authorization other dams and reservoirs that *might* use waters which would be availa-

ble if Glen Canyon Dam were operated in such a way that Rainbow Bridge Monument were flooded. It would be necessary to show—at least—that Congress had affirmatively required the use of such waters at such dams and reservoirs.

Against any such showing defendants can make must be counted the fact that on six occasions from 1960 to 1969 Congress was presented bills to repeal Section 3, but declined to enact any of them.[30] In a case in which Congress had twice refused an express repeal, the Supreme Court held that, in view of such history, no implied repeal could be found.[31] Surely where, contemporaneously with any measures claimed to work an implied repeal, Congress has repeatedly refused an express repeal, to find an implied repeal would violate the cardinal rule that the intent of the legislature to repeal must be clear and manifest.

F.2d 712, 719 (9th Cir. 1940), aff'd 312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488, reh. den. 312 U.S. 713, 61 S.Ct. 617, 85 L.Ed. 1144; Salich v. United States, 111 F.2d 712, 719 (9th Cir. 1940), aff'd 312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488, reh. den. 312 U.S. 713, 61 S.Ct. 618, 85 L.Ed. 1144. See also Federal Land Bank

of Wichita, Kansas v. Howell, 123 F.2d 50 (10th Cir. 1941),

30. See Note 21, *supra*, and accompanying text.

31. Georgia v. Pennsylvania R. Co., 324 U.S. 439, 457, 65 S.Ct. 716, 89 L.Ed. 1051 (1944).

Photograph by Edwin L. Wisherd

LOOKING THROUGH THE RAINBOW-TURNED-TO-STONE

According to Navajo mythology, a rainbow was here turned to stone, thus permitting certain hero gods to escape flood waters in the canyon. An ancient shrine still stands beneath the left-hand buttress. Note the man on the white rock in the gorge.

[A7539]

Photograph by Edwin L. Wisherd

THE RAINBOW NATURAL BRIDGE

The men standing at the upper base of the great arch afford some slight conception of its massive proportions; yet the "bridge" is dwarfed by the walls of the canyon itself. Devout Indians will not pass beneath the arch without saying prayers to their Supreme Being.

[A7540]

RAINBOW BRIDGE, UTAH.

Showing process of formation. On the left is the abandoned meander of ancient Bridge Creek. Photograph by A. R. Townsend.

[A7541]

## ORDER JUDGMENT AND DECREE

This cause came on for hearing on Motion of the plaintiffs for Summary Judgment and on Cross-Motion of the defendants for Summary Judgment, pursuant to Rule 56, Federal Rules of Civil Procedure; the Court having considered the pleadings, files, records and evidence in the action, including the Stipulation of Agreed Facts dated January 14, 1972, the Affidavit of James Moorman, the Affidavit and Supplemental Affidavit of David L. Crandall, and the Affidavit of Felix L. Sparks appended to the Memorandum of the State of Colorado in Opposition to Motion for Summary Judgment; the Court having considered the briefs and the arguments of counsel; the Court, after a consideration of all of the foregoing and with a fuller view of the applicable law, and due deliberation having been had thereon, it is

Ordered that plaintiffs' Motion for Summary Judgment be and the same hereby is granted, and it is further

Ordered that defendants' Cross-Motion for Summary Judgment be and the same hereby is denied, and it is further

Ordered, adjudged and decreed:

1. That the plaintiffs have standing to bring this action;

2. That this action is not barred by the doctrine of sovereign immunity;

3. That there are no indispensable parties who have not been joined;

4. That this matter stands ready for final determination on the merits;

5. That Section 3 of the Colorado River Storage Project Act of 1956 (43 U.S.C. § 620b), by its clear expression of congressional intent, and as a matter of law, is applicable to the Rainbow Bridge National Monument and the Glen Canyon Dam.

6. That Section 3 of the Colorado River Storage Project Act of 1956 (43 U.S.C. § 620b) has not been repealed by implication;

7. That Section 3 of the Colorado River Storage Project Act of 1956 (43 U.S.C. § 620b) is still in full force and effect and forbids the intrusion of waters from Lake Powell and the Glen Canyon unit into the Rainbow Bridge National Monument;

8. That it is the statutory duty of Rogers C. B. Morton, the Secretary of the Interior, and Ellis L. Armstrong, the Commissioner of the Bureau of Reclamation, forthwith to remove all waters which have already intruded from Lake Powell and the Glen Canyon unit from the Rainbow Bridge National Monument and to prevent the waters from Lake Powell and the Glen Canyon unit from entering the boundaries of the Rainbow Bridge National Monument at all times in the future; and

9. That Rogers C. B. Morton, the Secretary of the Interior, and Ellis L. Armstrong, the Commissioner of the Bureau of Reclamation, their agents, servants and employees, and all persons in active concert and participation with them, are directed to take forthwith whatever actions are necessary to remove from within the boundaries of the Rainbow Bridge National Monument any waters of Lake Powell and the Glen Canyon unit impounded there, and to take forthwith such actions as are necessary to prevent any waters of Lake Powell and the Glen Canyon unit from entering within the boundaries of Rainbow Bridge National Monument and they, and each of them, are permanently enjoined and restrained from permitting or allowing the waters of Lake Powell and the Glen Canyon unit to enter or remain within the boundaries of the Rainbow Bridge National Monument.

## ORDER DENYING DEFENDANTS' AND INTERVENORS' MOTION FOR STAY OF JUDGMENT PENDING APPEAL

The Court having heard evidence presented March 16th, March 27th, and April 2nd, 1973, by Defendants and Intervenors herein in support of their Motion for Stay of Judgment Pending Appeal, and having given due consideration to the same, and it appearing that De-

fendants and Intervenors have failed to show that they will be irreparably harmed if a stay is not granted, it is therefore

Ordered that Defendants' and Intervenors' Motion for Stay of Judgment Pending Appeal be, and the same is hereby denied.

MEMORANDUM IN SUPPORT OF ORDER DENYING DEFENDANTS' AND INTERVENORS' MOTION FOR STAY PENDING APPEAL.

There is no dispute that 4,000,000 acre feet of water will be released from Lake Powell to comply with the Court's order. That has been the basis for the discussions. None of that water will be spilled over the spillway; all of it will go through the turbines and produce extra power.

The witness told us that "we are able to dispose of this extra energy now;" that they now have a market for the maximum generation of the Glen Canyon power plant. The market is not at depressed prices; it is meeting their average price of about 3 mills a kilowatt hour.

This spring, during April–July, the run-off is estimated at about 8.4 million acre feet, and that is very close to the normal over a period of record. We are looking at a normal year. That run-off also can be put through the turbines and there is a market for it at normal prices.

There is no dispute that the release of roughly 4,000,000 acre feet to comply with the Court's order will develop $4,700,000 of additional revenue. And there is no disadvantage in marketing the energy in April rather than in August. The witness: "No, not at this time. At this time we gain—."

There also is no dispute that the Upper Basin states receive credit for the flow of that 4,000,000 acre feet of water when it passes the division point, at Lees Ferry, 15 miles below Glen Canyon Dam. Under the terms of the Colorado River Compact, Upper Basin states have an obligation to release to Lower Basin states, and perhaps, Mexico, a ten year running total of about 75,000,000 acre feet. Under the operating criteria that is about 8.23 million acre feet released each year to the Lower Basin. The 4,000,000 extra this spring will be stored in Lake Mead and be a payment or a credit against the amounts Upper Basin will owe Lower Basin. It won't have to be paid again; it is water in the bank. Both the extra revenue from sale of energy, and the credit against the continuing obligation to deliver water to the Lower Basin users are absolute, definite and certain advantages to the Upper Basin.

If 4,000,000 acre feet, additional acre feet, were released through the Glen Canyon turbines this year there would be no spill of the water at Hoover Dam this year; and there would be no cause for a spill at Davis or Parker Dams below Hoover.

Moreover, that 4,000,000 acre feet from Powell will produce electric energy again at Hoover Dam.

*Standards for Decision:*

The criteria for determining whether a motion for stay should be granted or denied are commonly formulated as follows:[1]

1. Has petitioner made a strong showing that he is likely to prevail on the merits of the appeal?

2. Has the petitioner shown that without a stay he will be irreparably injured?

3. Would the issuance of a stay substantially harm the other parties interested in the proceedings?

4. Where lies the public interest?

1. See, e. g., Virginia Petroleum Jobbers Assoc. v. Federal Power Comm'n, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958); Associated Securities Corp. v. S. E. C., 283 F.2d 773 (10th Cir. 1960); Pitcher v. Laird, 415 F.2d 743 (5th Cir. 1969); Bauer v. McLaren, 332 F.Supp. 723 (D. C.Iowa 1971).

Lengthy discussion of criteria 1 and 4 is not necessary. The Court has previously determined that this suit is properly before it, and that the actions of defendants are in violation of federal statute. Those were not close decisions; the Court is not convinced that it is likely defendants and intervenors can prevail on appeal. Moreover, the statute here in question settles the matter of the public interest. That statute (Section 3 of the Colorado River Storage Project Act) and the earlier presidential proclamation of 1909 establishing Rainbow Bridge Monument make it clear that the public interest lies in preventing any and all encroachments upon the Monument. Presumably, however, Rules 8 and 62 do not intend that the District Court may refuse to stay its order upon precisely the same grounds as those on which it issued the order. For that reason, extensive consideration has been given herein to the question of irreparable harm to defendants and intervenors if the stay is not granted.

*Damage to Defendants and Intervenors:*

Defendants and intervenors here claim, and plaintiffs apparently do not disagree, that compliance with the Court's order will necessitate release by defendants through Glen Canyon Dam of approximately 4 million acre feet of water in the next few months. Defendants and intervenors initially claimed that this amount of water would be lost outright to them, both as an asset with which the Upper Basin states (of whom intervenors Utah and Colorado are two) might pay part of their obligation, under Article III of the Colorado River Compact and P.L. 90–537, to deliver water to the Lower Basin and Mexico, and as a source of electric power revenues which, under Article V of the Compact, are credited to the benefit of the Upper Basin states in the Upper Colorado River Basin Fund. Defendants and intervenors have since abandoned both of these claims.

Instead, defendants and intervenors now claim that they will be irreparably damaged by this release of water because it will so disrupt scheduled operation of Glen Canyon Dam as to result in a net loss of $2 million in power revenues over the next 3 to 4 years. They propose the figure of $2 million as the measure of their losses if the Court's order is *not* stayed.

It is immediately evident that there is here no claim of loss to the defendants, the Secretary of the Interior and the Commissioner of the Bureau of Reclamation. They own no interest in the Upper Basin Fund to which these additional power revenues would be credited. They are sued in their individual capacities; thus, they can enforce no claim of the United States to these power revenues. (It appears that Congress at any time could abolish the Upper Basin Fund and divert these monies to other purposes.) Moreover, the blanket claim of intervenors to all revenues that might enter the Upper Basin Fund must be discounted by one-third: 32.5% of the Upper Basin Fund belongs to Wyoming and New Mexico, but those states decline to present any claims in this action. In sum, defendants claim no damage here, and intervenors can claim only a part of the loss they allege will occur.

The risk of loss of power generating revenues results from the fact, according to defendants and intervenors, that water released through the turbines at Glen Canyon Dam when the Lake is at a lower elevation will produce less power than the same amount of water released when the Lake is at a higher level. This is said to be due to the difference in pressure on the turbines. Of course, release of 4 million acre feet of water through the Dam will lower the level of the Lake for some length of time. Defendants and intervenors say this time —the time it will take, if the Court's order is reversed, to recoup storage in the Lake to bring it back up to its level immediately prior to issuance of the order —will be 3 to 4 years. The loss in power revenues over this time, due to producing power by release of water at a lower Lake level, defendants and interve-

nors say will be $2 million. Plaintiffs have shown, however, by defendants' and intervenors' witness, that the efficiency of the turbines at Glen Canyon Dam is roughly equal when the level of Lake Powell is 3,606 feet above sea level (as required by the order) and when the Lake is at 3,650 feet above sea level (the average elevation over time if the order is not enforced). Defendants and intervenors make no effort to dispel the doubt this casts upon their argument. Moreover, plaintiffs say, defendants and intervenors have failed to substantiate their claim that recoupment of storage in Lake Powell will take 3 to 4 years. That is, plaintiffs would say that defendants and intervenors have not only failed to prove a quantum of damage, they have failed to show that any damage resulting would be irreparable.

The central problem of proof in this proceeding has been the problem of showing probable inflow of water into Lake Powell in the near future. Plaintiffs, and defendants and intervenors, do not disagree about predictions that have been made in the proceedings about the performance of Glen Canyon Dam and Lake Powell during the *current year*. These have been based upon *current data*, including measurement of precipitation and snowfall in the Upper Basin, and survey of existing and immediate power demand. For the purpose of showing probable performance in 1974, 1975 and 1976, however, expert witnesses for defendants and intervenors have adopted methods of prediction which, while they might be useful to administrators of the Upper Basin system of reclamation projects in making broad, general plans for long-term operations, are essentially useless to demonstrate short-term actual performance. They have used a method which condenses the extremely wide fluctuations and disparities of historical streamflows into a historical average, and this they have pro-

jected into the years 1974, 1975 and 1976 in order to predict actual performance in those years. Defendants' and intervenors' expert witness admits that the picture thus presented may prove to be wholly inaccurate. The question use of this method of proof presents, then, is not so much whether defendants and intervenors have carried their point by a preponderance of the evidence, but whether they have presented the Court with any evidence on their point at all.

Having been presented with an entirely artificial construct which bears no demonstrable resemblance to what may in fact occur, the Court is left to wonder whether, if actual inflow into Lake Powell in the next 3 to 4 years is as high as actual flows in the River near that point in the past have proven that it can be, any loss of elevation in the Lake will be offset rapidly, rendering negligible any resulting loss of power revenues. For aught that has been shown here, this result is at least as likely as that the loss of power revenues due to enforcement of the Court's order will be $2 million.

▮▮▮ Defendants and intervenors have not made an adequate showing of loss. While it is true that this Court may base judgment upon damages reasonably inferred from facts properly proven, the Court cannot rest its decision upon a showing of damages which is entirely speculative.[2]

*Damages to Plaintiffs:*

The Court's order of February 27th was issued to prevent damage to the interests of plaintiffs. Defendants and intervenors have offered nothing which shows that if the Court's order is stayed damage will not occur to the interests of plaintiffs.

The parties here agree, on the basis of current data, that if the Court's order is stayed scheduled operation of Lake Powell will bring waters of the Lake approx-

---

2. E. g., Bigelow v. R. K. O. Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1956), reh. den. 327 U.S. 817, 66 S.Ct. 815, 90 L.Ed. 1040; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

imately 1,500 feet into Rainbow Bridge Monument at an elevation of approximately 3,643 feet above sea level in the months of July and August. Thereafter, the water would recede, but the evidence does not make clear to what level. The intrusion this year will be approximately 900 feet further into the Monument than ever before. Of course, if the Court's order were stayed now but upheld on appeal defendants would be required at a later date to remove any water then within the Monument.

■ The question presented is whether this partial flooding of the Monument during the appeal time results in any substantial damage to plaintiffs. Defendants and intervenors take the position that because the flooding would be temporary no permanent damage is in prospect, and that in any case the damage is negligible because it does not occur to the Bridge itself and because it largely duplicates the flooding of last year which the Court did not enjoin.

A showing of permanent damage is not required of plaintiffs, only a showing of substantial damage. Plaintiffs' interest in preserving the pristine condition of the Monument, founded in Section 3 of the Storage Project Act which forbids all intrusions of the Lake whatever, is clearly infringed by even a temporary intrusion of the Lake, and even if no permanent scars result. Plaintiffs' sole witness made it clear that even a temporary flooding substantially alters the aesthetic aspect of the Monument and interferes with the traditional use and enjoyment of the Monument, which has been to walk the course of Bridge Creek up to the site of the Arch. Moreover, this is not the first spring that the waters of Lake Powell, under the management of defendants and in flagrant violation of the clear mandate of Congress, have invaded the Monument. This is the third year. That is, the damage this year is cumulative and aggravates the damage previously caused.

Of course, it is of no moment that the flooding this year will not reach the Arch. It is not merely the Arch that is protected—not merely the Arch in which plaintiffs have an interest. Moreover, it is of no moment that the Court did not enjoin a less extensive flooding last year. Defendants' and intervenors' apparent conclusion that because the Court did not hasten to a decision of this case last year the Court must regard partial flooding of the Monument as *de minimis* is simply mistaken and justifies no expectations on their part that the even more extensive flooding this year will not be enjoined.

*Findings and Conclusions:*

■ Defendants and intervenors have failed to make an adequate showing on any of the four criteria applicable to the decision whether or not to grant a stay of judgment pending appeal. The Court is not convinced that defendants and intervenors are likely to prevail on appeal. Defendants and intervenors have made no showing beyond mere speculation that they will be irreparably harmed if the order is not stayed. Indeed, defendants cannot be understood even to have claimed that they will be injured. It clearly appears that the interests of plaintiffs will be damaged if the order is not enforced. Indeed, the allegations of defendants' motion with regard to injury to plaintiffs may be taken as an admission that injury will ensue. Finally, Congress has long since settled that the interest of the public herein lies in protecting the Monument at all times.